DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
By: KEVIN MEAD and JUN XIANG
One St. Andrew's Plaza
New York, New York 10007
Tel: (212) 637-2211/2289

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------

UNITED STATES OF AMERICA,

                Plaintiff,

      - v. -

$120,869.25 IN UNITED STATES CURRENCY
FORMERLY ON DEPOSIT IN BANK OF
AMERICA, ACCOUNT 466008806549, HELD
IN THE NAME OF "DELATECH VENTURES
LLC," AND ALL FUNDS TRACEABLE
THERETO,

AND

$239,742.36 IN UNITED STATES CURRENCY
FORMERLY ON DEPOSIT IN SUNTRUST
BANK ACCOUNT 1000247182099 HELD IN
THE NAME OF "PAUL UK EXPORTS," AND
ALL FUNDS TRACEABLE THERETO,

              Defendants-*in-rem*.

--------------------------------------------------------

**VERIFIED CIVIL
COMPLAINT FOR
<u>FORFEITURE</u>**

**22 Civ. _____**

Plaintiff United States of America, by its attorney, Damian Williams, United States Attorney for the Southern District of New York, for its verified civil complaint, alleges, upon information and belief, as follows:

## <u>JURISDICTION AND VENUE</u>

1.      This action is brought pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and 981(a)(1)(C) by the United States of America seeking the forfeiture of the following (a through b below, collectively, the "Defendants-*in-rem*"):

a. $120,869.25 in United States currency, formerly on deposit in Bank of America Account 466008806549, held in the name of "Delatech Ventures LLC," (the "DELATECH Account"),

b. $239,742.36 in United States currency, formerly on deposit in Suntrust Bank Account 1000247182099, held in the name of "Paul UK Exports," (the "PAUL UK Account"),

2. This Court has original jurisdiction over this forfeiture action pursuant to Title 28, United States Code, Sections 1345 and 1355.

3. Venue is proper pursuant to Title 28, United States Code, Section 1395 because the Defendants-*in-rem* are currently held in the Seized Asset Deposit Fund Account of the United States Marshals Service (the "USMS") located within the judicial district for the Southern District of New York. Venue is also proper pursuant to Title 28, United States Code, Section 1355 (b)(1)(A) because the acts and omissions giving rise to the forfeiture took place in the Southern District of New York.

4. As set forth below, there is probable cause to believe that the Defendants-*in-rem* are subject to forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(A) as property involved in money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957, and pursuant to Title 18, United States Code, Section 981(a)(1)(C) as proceeds traceable to mail and wire fraud in violations of Title 18, United States Code, Sections 1341 and 1343, or property traceable thereto.

## FACTUAL ALLEGATIONS

5. This action arises out of an investigation conducted by the Federal Bureau of Investigation, the United States Secret Service, and Special Agents with the United States

Attorney's Office of the Southern District of New York into a conspiracy (the "Conspiracy") to defraud victims via business email compromise ("BEC") schemes and romance schemes, and to launder the fraudulently acquired funds.

6.     The Government has charged 14 defendants with the Conspiracy via two criminal complaints and two indictments:

a.     On or about February 11, 2020, a criminal complaint captioned 20 Mag. 1546 was sworn to before the Hon. Robert W. Lehrburger, United States Magistrate Judge for the Southern District of New York, and arrest warrants issued for the arrests of Jacob Sagiao, Marylynn Peneueta, Britt Jackson, Joshua Fitten, Dontae Cottrell, Arinze Obika, Ndukwe Anyaogu, Herman Bass, David Uro, and Victor Ahaiwe, on charges of, *inter alia*, bank fraud conspiracy, in violation of Title 18, United States Code, Section 1349 and money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h) (the "February 11, 2020 Complaint"). The February 11, 2020 Complaint is attached hereto as Exhibit A and is incorporated by reference as if set forth fully herein.

b.     On or about February 29, 2020, a criminal complaint captioned 20 Mag. 2434 was sworn to before the Hon. Sarah L. Cave, United States Magistrate Judge for the Southern District of New York, and arrest warrant issued for the arrest of Prince Uko on charges of, *inter alia*, money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h) (the "February 29, 2020 Complaint"). The February 29, 2020 Complaint is attached hereto as Exhibit B and is incorporated by reference as if set forth fully herein.

c.     On or about March 4, 2020, Uko, Sagiao, Peneueta, Jackson, Fitten, Cottrell, Obika, Anyaogu, Bass, Uro, and Ahaiwe were charged in a five-count Indictment, 20 Cr.179 (DLC) (the "Original Indictment"), with, *inter alia*, bank fraud conspiracy, in violation of

Title 18, United States Code, Sections 1349 ("Count One") and money laundering conspiracy, in violation of Title 18, United States Code, Sections 1956(h) ("Count Two"). The Original Indictment also charged Jackson with wire fraud, in violation of Title 18, United States Code, Section 1343 (Count 4). The Original Indictment is attached hereto as <u>Exhibit C</u> and is incorporated by reference as if set forth fully herein. Those charges remain pending as of the filing of this Complaint.

       d.     On or about August 5, 2020, Sunday Okoro, Collins Eneh, and Ikechukwu Elendu were charged in a two-count superseding Indictment (the "Superseding Indictment") with money laundering conspiracy, in violation of Title 18, United States Code, Sections 1956(h) ("Count One") and bank fraud conspiracy, in violation of Title 18, United States Code, Sections 1349 ("Count Two").  The Superseding Indictment is attached hereto as <u>Exhibit D</u> and is incorporated by reference as if set forth fully herein. Those charges remain pending as of the filing of this Complaint.

       7.     In connection with its investigation into the Conspiracy, the Government obtained seizure warrants on March 27, 2020 (the "March 27 Seizure Warrant") and June 1, 2020 (the "June 1 Seizure Warrant") for the contents of various accounts which contained the proceeds of the schemes, or that were involved in or facilitated the schemes, or that contained monies traceable thereto. Those warrants were executed and the contents of the accounts thereafter seized by the United States Marshals and deposited the funds in the Seized Asset Deposit Fund Account with the Federal Reserve Bank.

       8.     Law enforcement officers have been investigating at least two different business email compromise schemes, which are described in greater detail in the attached February 11, 2020 Complaint ("BEC-1" and "BEC-2"), and which involve some of the same

criminal actors that form the basis of the seizures.

9.     In each of the BEC schemes, the victims were fraudulently induced by emails that purported to be from employees or counterparties to transfer funds into accounts that the victims thought belonged to legitimate businesses, but were in fact accounts controlled by various criminals.  Those criminals then laundered the proceeds by moving them through different accounts in an attempt to conceal the true origin of the proceeds of the fraudulent activity.

10.     As the investigation into the BEC schemes progressed, the Government learned that the Conspiracy also involved romance schemes (the "Romance Schemes") whereby members of the Conspiracy adopted fake online identities to gain victims' affection and trust, and then used the illusion of a romantic relationship to steal from the victims.

11.     In addition, the Government seized and searched several cellphones from members of the Conspiracy pursuant to judicially authorized warrants.  The Government identified WhatsApp messages on those seized cellphones where members of the Conspiracy directed other members how to launder fraudulent proceeds (the "Money-Laundering WhatsApp Messages").

12.     By this Complaint, the United States is now seeking the forfeiture of the funds held in those accounts, herein referred to collectively as the Defendants-*in-rem*. Probable cause for the forfeiture of each of the Defendants-*in-rem* is set out more fully below.

13.     This Complaint proceeds as follows:

a.     Section A describes the Romance Schemes, and explains why they establish probable cause for forfeiture of the DELATECH VENTURES Account.

b.     Section B describes the Money-Laundering WhatsApp Messages,

and explains why they establish probable cause for forfeiture of the PAUL UK Account.

A.  **The Romance Schemes and Factual Allegations for the DELATECH VENTURES Account**

14.     Federal law enforcement agents have investigated a fraud involving an individual victim who resides in Pennsylvania ("Victim-1").[1] Victim-1 claims to have met an individual in an online dating website, who identified himself as "Joseph Cordoba." As set forth in greater detail below, investigators were able to determine that "Joseph Cordoba" was in fact a false identity created to defraud Victim-1.

15.     After initially meeting on the dating website, Victim-1 and "Joseph Cordoba" continued their communications by email and by phone.

16.     In the course of their communications, "Joseph Cordoba" told Victim-1 he operated an interior design business in Connecticut (the "Phony Design Business"). Based upon a review of open source and law enforcement data bases, investigators learned that the Phony Design Business does not exist.

17.     Also in the course of their communications, "Joseph Cordoba" told Victim-1 he lives at an address in Connecticut.  Investigators later determined that such address does not exist.

18.     In or about July 2019, "Joseph Cordoba" told Victim-1 that he needed money to pay import taxes on furniture for his Phony Design Business to an importer (the "Phony Importer").  In reliance on this and other subsequent telephone and email communications, Victim-1 mailed a $10,000 check, payable to the Phony Importer, addressed to Britt Jackson, one of the individuals involved in BEC-1 described above. "Joseph Cordoba" had described Jackson to

---

[1] The romance fraud against Victim-1 is described in greater detail in the February 11, 2020 Complaint, which refers to it as the Online Romance Fraud.  Ex. A at ¶¶ 17-18.

Victim-1 as the Phony Importer.

19.     Also in or about July 2019, "Joseph Cordoba" advised Victim-1 in phone and email communications that he needed money to pay shipping charges on furniture for his Phony Interior Design Business. "Joseph Cordoba" asked Victim-1 for the money and advised that he would treat it as a loan.  In reliance on these representations and on the promissory note executed by "Joseph Cordoba," Victim-1 made the following wire transfers:

a.     On or about July 16, 2019, Victim-1 wired $16,500 to Britt Jackson, to a bank account provided by "Joseph Cordoba" ("Bank Account-1").[2]

b.     On or about July 24, 2019, Victim-1 wired an additional $30,000 to Britt Jackson by transferring the funds to Bank Account-1.

20.     Britt Jackson is one of the individuals involved in BEC-1, described above.

21.     Investigators later obtained bank records for Bank Account-1, and learned that it was, in fact, a bank account located in Georgia, that had been opened in person by Britt Jackson on or about November 19, 2018.

22.     In the course of their investigation, law enforcement observed Britt Jackson on bank surveillance withdrawing cash at the ATM on or about July 16, 2019 – the same day Victim-1 wired $16,500 into Bank Account-1.

23.     Bank records and surveillance cameras also revealed that on or about July 18, 2019, Britt Jackson is observed at the teller's window, where he withdrew a cashier's check in the amount of $17,200.

24.     Additionally, on or about July 26, 2019, after Victim-1 wired $30,000 into

---

[2] Bank Account-1 is not one of the defendant-in-rem accounts named herein.  Bank Account-1 corresponds to Bank Account-13 in the February 11, 2020 Complaint.

Bank Account-1, Britt Jackson wire transferred $23,965.00 to a bank account in Canada.[3]

25.     In or about August 2019, "Joseph Cordoba" advised Victim-1 that he needed funds to pay for fees related to the estate of his father, which was "worth millions." He advised Victim-1 that he would treat any such funds provided for this purpose as a loan and executed a promissory note.

26.     On or about August 21, 2019, in reliance on these representations, Victim-1 wired $80,000 to a bank account located in Hong Kong.

27.     In or about the summer of 2019, Victim-1 and "Joseph Cordoba" made plans to meet in Manhattan.  In reliance thereon, Victim-1 made hotel and travel arrangements.  At the last minute, "Joseph Cordoba" canceled the meeting.  Victim-1 has never met "Joseph Cordoba" in person.

28.     "Joseph Cordoba" has not repaid any of the promissory notes he executed to Victim-1.

### 1.  The DELATECH VENTURES Account

29.     On or about March 25, 2020, the Hon. Sarah L. Cave, United States Magistrate Judge for the Southern District of New York, signed a warrant to search the email accounts of "Joseph Cordoba" and Victim-1 (the "Cordoba Email" and the "Victim-1 Email"). Investigators reviewed the correspondence in the Cordoba Email and the Victim-1 Email and determined that the Cordoba Email appears to exist for the purpose of perpetrating or attempting to perpetrate romance frauds on many individuals.

30.     Investigators spoke to Victim-1 and confirmed that Victim-1 continues to

---

[3] This account in Canada was also the recipient of funds transferred by other co-conspirators named in the Original Indictment that were involved in BEC-1 and BEC-2.

email and speak with "Joseph Cordoba," and that in addition to wiring funds to Bank Account-1, as described above, "Joseph Cordoba" has also asked Victim-1 to wire money to the DELATECH VENTURES Account.

31.    Specifically, in or about March 2020, "Joseph Cordoba" told Victim-1 that he needed to ship important documents to the United States via special courier service in connection with "Joseph Cordoba's" father's estate.  "Joseph Cordoba" asked Victim-1 to make a payment to cover the cost of that courier service.

32.    Soon thereafter, on or about March 24, 2020, a representative of "Secure World Logistics" emailed Victim-1 and asked him to make a $4,600 - $4,800 payment to the DELATECH VENTURES Account in order to assist in the transport of those documents.

33.    A review of the email account of Victim-1 confirms that the email from "secureworldlogistics.com" purports to be written by a prominent former American diplomat (the "Diplomat").

34.    The author of the email also sent a picture of what purported to be a picture of the Diplomat's passport.  However, the passport is believed to be fraudulent as investigators could find no evidence that there is any "Diplomat" that works for "Secure World Logistics."

35.    Further, investigators concluded that "Secure World Logistics" is not a legitimate company, but that it appears to exist for the purpose of committing frauds such as this one.

36.    Victim-1 did not send funds to the DELATECH VENTURES Account at this time.  However, as a result of this investigation, other additional victims who transferred funds to the DELATECH VENTURES Account have been identified.

37.    Investigators reviewed records provided by Bank of America related to the

DELATECH VENTURES Account, which revealed activity that is inconsistent with an account belonging to an international logistics business.

38.     According to the bank records, between March 19, 2020 and the present, the DELATECH VENTURES Account received nine wires from nine separate individuals in amounts varying from $2,075 to $28,180.

39.     Investigators believe these nine wires to be from individuals who were victims of romance frauds.

40.     The most recent wire was sent by a victim ("Victim-2") on or about May 7, 2020, and was in the amount of $9,000 (the "May 7 Wire").

41.     Investigators spoke to Victim-2, a 69 year old who told investigators that he met an individual named "Jones Cooper" on a website intended to allow individuals to make friends with each other.

42.     "Jones Cooper" purported to reside in California and to work for a company that repairs high-end machinery for the United States military in foreign countries.

43.     Victim-2 has never met "Jones Cooper" in person.

44.     Over the course of the past year, "Jones Cooper" told Victim-2 many times that "Jones Cooper's" bank accounts had been frozen because he was abroad, and asked Victim-2 for transfers of money so that "Jones Cooper" could meet his expenses.  Victim-2 made multiple payments to "Jones Cooper" via PayPal that totaled tens of thousands of dollars.

45.     "Jones Cooper" recently contacted Victim-2 to tell him that "Jones Cooper" had been out of the country fixing machinery for the United States military, and was unable to reenter the country due to the COVID-19 pandemic.  "Jones Cooper" further told Victim-2 that he was in the Bahamas waiting to reenter the United States, and that he had been staying at a hotel in

the Bahamas for approximately one month.  "Jones Cooper" told Victim-2 that he needed $9,000 to pay his hotel bill in the Bahamas.  In reliance on these representations, Victim-2 sent "Jones Cooper" $9,000 to the DELATECH VENTURES Account to, as he believed, cover "Jones Cooper's" hotel bill.

46.     Based on the foregoing, investigators concluded that the DELATECH VENTURES Account existed solely for the purpose of receiving the proceeds of wire frauds, in particular, that a) it was intended to receive the proceeds of the Romance Fraud perpetrated on Victim-1, b) it did receive the proceeds of a fraud perpetrated against Victim-2; and c) based on the account records, it is believed to have received the proceeds of several other frauds.

47.     On or about June 1, 2020, the Honorable Stewart D. Aaron, United States Magistrate Judge for the Southern District of New York, issued the June 1 Seizure Warrant captioned 20 Mag. 5695 for the DELATECH VENTURES Account (a copy of which is attached hereto as <u>Exhibit E</u>, and is incorporated by reference as if set forth fully herein), authorizing the seizure of all funds on deposit in the DELATECH VENTURES Account upon a finding that the DELATECH VENTURES Account contained funds representing proceeds traceable to the Romance Fraud scheme.

48.     On or about June 2, 2020, pursuant to the June 1 Seizure Warrant, the Government seized $120,869.25 from the DELATECH VENTURES Account.

### B.    <u>The Money Laundering WhatsApp Messages and Factual Allegations for the PAUL UK Account</u>

49.     As a result of this investigation, and pursuant to the February 11, 2020 Complaint, on or about February 28, 2020, law enforcement officers arrested Britt Jackson. He was thereafter interviewed, during which time he turned over his cellphone and gave his consent for it to be searched.

50.     During the interview, Jackson showed law enforcement officers communications he made with two individuals through the mobile messaging application "WhatsApp": one with the username "Josephdamon" and one with the username "Princejoseph."

51.     Jackson told the investigators that he received large amounts of money by check or wire, and then in turn transferred most of that money to other individuals, while keeping a portion for himself.  Jackson stated that he usually did not know the individuals and companies he was receiving money from and sending money to, and that the transfers were not made for any legitimate purpose.

52.     Jackson told the investigators that "Josephdamon" and "Princejoseph" were the two individuals who told him—via WhatsApp messages—what money he would receive, where he should transfer it, and how much money he should transfer in the money laundering scheme.

53.     Based upon this description, investigators concluded that Jackson was involved in an illegal money laundering scheme being directed in part by "Josephdamon."

54.     A review of the WhatsApp messages between Jackson and "Josephdamon" confirms what Jackson told law enforcement officers. Some of the WhatsApp messages reviewed by investigators include the following:

        a.      On or about November 9, 2019, "Josephdamon" messaged Jackson "91,320."  Investigators familiar with such money laundering schemes determined that by this message, "Josephdamon" was directing Jackson to send that exact amount of money to a particular account.

        b.      On or about November 18, 2019, "Josephdamon" messaged Jackson "88,320."  Investigators determined that by this message, "Josephdamon" was directing

Jackson to send that exact amount of money to a particular account.

        c.      On or about November 19, 2019, "Josephdamon" messaged Jackson "Check your chase company some there."  Investigators determined that by this message, "Josephdamon" was telling Jackson that some amount of money had been sent to a bank account Jackson held in a corporate name at JPMorgan Chase.

        d.      On or about November 20, 2019, "Josephdamon" messaged Jackson, "Take the picture very well make sure you snap everything and send it again.  Please. Take the picture of the hole paper."  Investigators determined that by this message, "Josephdamon" was telling Jackson to take a picture of a bank statement to confirm that he had received and sent money as directed.

        e.      On or about December 3, 2019, "Josephdamon" messaged Jackson, "2,463 in there.  You getting $246.  Take out the rest.  Take out $2,216."  Investigators determined that by this message, "Josephdamon" was directing Jackson how much money he would receive in his bank account and what his "cut" of the money-laundering proceeds would be.

        f.      On or about January 31, 2020, "Josephdamon" messaged Jackson "Cashier check $40,040.  Prince K Uko."  Investigators determined that by this message, "Josephdamon" was directing Jackson to write a cashier's check for that amount of money made out to "Prince K Uko," and to keep a portion of funds as payment for his money transferring services.

        55.      A review of the WhatsApp messages between Jackson and "Princejoseph" also confirms what Jackson told law enforcement officers: that Jackson was engaged in a money laundering scheme being directed, in part, by "Princejoseph."  In particular, some of the WhatsApp messages between Jackson and "Princejoseph" revealed that:

a.      On or about July 25, 2019, JACKSON messaged "Princejoseph" the account information for a bank account with SWIFT and routing numbers for a bank account.

b.      On or about September 11, 2019, JACKSON messaged "Princejoseph" the account information for a bank account with SWIFT and routing numbers for a bank account.

c.      On or about September 13, 2019, "Princejoseph" messaged JACKSON the account information for a bank account with a routing number for a bank account.

d.      On or about September 13, 2019, Jackson sent "Princejoseph" bank account information and then messaged, "I THINK YOU SHOULD USE THIS ACCOUNT 4 THE 800K!!!"   Investigators determined that by this message, Jackson was instructing "Princejoseph" to direct the $800,000 that needed to be laundered to the account Jackson suggested.

e.      On or about October 14, 2019, "Princejoseph" messaged Jackson, "Did you take out the money yet??"  Investigators determined that by this message, "Princejoseph" was inquiring as to whether Jackson had transferred the money he was supposed to transfer as part of the money-laundering scheme."

f.      On or about November 20, 2019, Jackson messaged "Princejoseph," "I GOT THE CHECK!!!  I WILL DEPOSIT IT N THE MORNING!!!"  Investigators determined that by this message, Jackson was advising "Princejoseph" that he had received a cashier's check as part of the money-laundering scheme.

107.    Law enforcement officers determined that "Princejoseph" was an individual named Prince Uko and that "Josephdamon" was an individual known as Sunday Okoro.  Uko was charged in the Original Indictment and Okoro was charged in the Superseding Indictment.

108.    Jackson's messages with "Princejoseph" and "Josephdamon" involve all three of them messaging bank account information to each other many times, with no legitimate business purpose for such transactions.   Based upon these messages, as well as Jackson's statements in his interview, investigators concluded that the messages were sent to designate the bank accounts that were intended to send or receive money as part of Conspiracy.

108.    As set forth below, the Conspiracy involved, among others, one of the Defendants-in-rem, the funds formerly on deposit in the PAUL UK Account.

### 1.   The PAUL UK Account

109.    On or about August 2, 2019, "Josephdamon" messaged Jackson the account information for the PAUL UK Account with a SWIFT and routing number.

110.    On or about August 27, 2019, Jackson messaged "Josephdamon" the account information for the PAUL UK Account along with a SWIFT and routing number.

111.    On or about November 2, 2019, Jackson messaged "Josephdamon" the account information for the PAUL UK Account along with a SWIFT and routing number.

112.    On or about March 27, 2020, the Hon. Sarah L. Cave, United Sates Magistrate Judge for the Southern District of New York, issued the March 27 Seizure Warrant, captioned 20 Mag. 3338 (a copy of which is attached as Exhibit F and incorporated herein by reference) authorizing the seizure of, *inter alia*, all funds on deposit in the PAUL UK Account, upon a finding that the PAUL UK Account contained funds representing proceeds traceable to and/or property involved in the money laundering schemes.

113.    Pursuant to the March 27 Seizure Warrant, the Government seized $239,742.36 in United States currency from the PAUL UK Account.

## CLAIMS FOR FORFEITURE

### Forfeiture Under 18 U.S.C. § 981(a)(1)(A)
### (Property Involved in a Transaction or Attempted Transaction in Violation of 18 U.S.C. § 1956 or Property Traceable to Such Property)

114.    Paragraphs 1 through 113 of this Complaint are repeated and re-alleged as if fully set forth herein.

115.    Pursuant to Title 18, United States Code, Section 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1956, or any property traceable to such property, is subject to forfeiture to the United States.

116.    18 U.S.C. § 1956(a)(1)(A)(i) & (a)(1)(B)(i) imposes a criminal penalty on any person who:

> knowing that the property involved in a financial transaction involves the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . .
>
> (A)(i) with the intent to promote the carrying on of specified unlawful activity;
>
> (B)    knowing that the transaction is designed in whole or in part (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

117.    As defined in 18 U.S.C. § 1956(c)(7), "specified unlawful activity," includes, among other things, racketeering activity as defined in 18 U.S.C. § 1961(1).  Section 1961(1), in turn, defines racketeering activity to include wire fraud, in violation of 18 U.S.C. § 1343.

118.    Title 18, United States Code, Section 1343 provides, in relevant part:

> Whoever, having devised or intending to devise any scheme or
> artifice to defraud, or for obtaining money or property by means of
> false or fraudulent pretenses, representations, or promises,
> transmits or causes to be transmitted by means of wire, radio, or
> television communication in interstate or foreign commerce, any
> writings, signs, signals, pictures, or sounds for the purpose of
> executing such scheme or artifice, shall be fined under this title or
> imprisoned not more than 20 years, or both.

119.    By reason of the foregoing the Defendants-*in-rem* are subject to forfeiture

to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A) as property

involved in a money laundering transaction or an attempted money laundering transaction, in

violation of Title 18, United States Code, Section 1956, or as property traceable to such property.

**Forfeiture Under18 U.S.C. § 981(a)(1)(A)**
**(Property Involved in a Transaction or Attempted Transaction in Violation of 18 U.S.C. §**
**1957 or Property Traceable to Such Property)**

120.    Paragraphs 1 through 119 of this Complaint are repeated and re-alleged as

if fully set forth herein.

121.    Pursuant to Title 18, United States Code, Section 981(a)(1)(A) any

property, real or personal, involved in a transaction or attempted transaction in violation Title 18,

United States Code, Section 1957, or any property traceable to such property, is subject to

forfeiture to the United States.

122.    18 U.S.C. § 1957 imposes a criminal penalty on any person who

"knowingly engages or attempts to engage in a monetary transaction in criminally derived

property of a value greater than $10,000 and is derived from specified unlawful activity."

Section 1957(f)(1) defines "monetary transaction" to include the "deposit, withdrawal, transfer,

or exchange, in or affecting interstate or foreign commerce, of funds . . . ."

123.    Section 1957(f)(3) defines "specified unlawful activity" to have the same

meaning as given in Section 1956. As set forth above, wire fraud, in violation of 18 U.S.C. §

1343, is a specified unlawful activity for purposes of Section 1956.

124.    By reason of the foregoing the Defendants-*in-rem* are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A) as property involved in a money laundering transaction or an attempted money laundering transaction, in violation of Title 18, United States Code, Section 1957, or as property traceable to such property.

**Forfeiture Under 18 U.S.C. § 981(a)(1)(C)**
**(Property Constituting or Derived from Proceeds Traceable to a Violation of 18 U.S.C. §**
**1343 or Property Traceable to Such Property)**

125.    Paragraphs 1 through 124 of this Complaint are repeated and re-alleged as if fully set forth herein.

126.    Pursuant to Title 18, United States Code Section 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity" as defined in section 1956(c)(7) of this title, or a conspiracy to commit such offense.

127.    As set forth above, for purposes of Section 1956, "specified unlawful activity" includes wire fraud, in violation of 18 U.S.C. § 1343.

128.    By reason of the foregoing the Defendants-*in-rem* are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) as property constituting or derived from proceeds traceable to a violation of Title 18, United States Code, 1343.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendants-*in-rem* and that all persons having an interest in the Defendants-*in-rem* be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendants-*in-rem* to the United States of America for

disposition according to law, and that this Court grant plaintiff such further relief as this Court

may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
      May 19, 2022

                              DAMIAN WILLIAMS
                              United States Attorney for the
                              Southern District of New York
                              Attorney for the Plaintiff
                              United States of America

By:                _____
                              Kevin Mead / Jun Xiang
                              Assistant United States Attorneys
                              One St. Andrew's Plaza
                              New York, New York 10007
                              Telephone: (212) 637-2211/2289

## <u>DECLARATION OF VERIFICATION</u>

JARED EANNUCCI, pursuant to Title 28, United States Code, Section 1746, hereby

declares under penalty of perjury that he is a Special Agent with the Southern District of New

York ("SDNY"); that he has read the foregoing Verified Complaint and knows the contents

thereof; that the same is true to the best of his knowledge, information and belief; and that the

sources of his information and the grounds of his belief are his personal involvement in the

investigation, and conversations with and documents prepared by law enforcement officers and

others.

Executed on May 19, 2022

                                                  _____
                                                    JARED EANNUCCI
                                                    Special Agent
                                                    Southern District of New York

# EXHIBIT A

Approved: _____
              JUN XIANG / KEVIN MEAD
              Assistant United States Attorneys

Before:    THE HONORABLE ROBERT W. LEHRBURGER
              United States Magistrate Judge
              Southern District of New York

- - - - - - - - - - - - - - - - - X
                                         :
UNITED STATES OF AMERICA                 :      SEALED COMPLAINT
                                         :
      - v. -                             :      Violations of
                                         :      18 U.S.C. §§ 1028A,
JACOB SAGIAO,                            :      1343, 1349, 1956(h), and
MARYLYNN PENEUETA,                       :      2
BRITT JACKSON,                           :
JOSHUA FITTEN,                           :      COUNTY OF OFFENSE:
DONTAE COTTRELL,                         :      NEW YORK
ARINZE OBIKA,                            :
NDUKWE ANYAOGU,                          :
HERMAN BASS,                             :
DAVID URO, and                           :
VICTOR AHAIWE,                           :
                                         :
                     Defendants.         :
                                         :
- - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

          JARED EANNUCCI, being duly sworn, deposes and says
that he is a Task Force Officer with the United States
Attorney's Office for the Southern District of New York and an
Officer with U.S. Customs and Border Protection, and charges as
follows:

COUNT ONE
(Conspiracy to Commit Bank Fraud)
(Business Email Compromise)

          1.   From at least in or about March 2019 up to and
including at least in or about May 2019, in the Southern
District of New York and elsewhere, JACOB SAGIAO, MARYLYNN
PENEUETA, BRITT JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE
OBIKA, NDUKWE ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR

1

AHAIWE, the defendants, and others known and unknown, willfully
and knowingly, did combine, conspire, confederate, and agree
together and with each other to commit bank fraud, in violation
of Title 18, United States Code, Section 1344.

2.    It was a part and an object of the conspiracy
that JACOB SAGIAO, MARYLYNN PENEUETA, BRITT JACKSON, JOSHUA
FITTEN, DONTAE COTTRELL, ARINZE OBIKA, NDUKWE ANYAOGU, HERMAN
BASS, DAVID URO, and VICTOR AHAIWE, the defendants, and others
known and unknown, willfully and knowingly, would and did
execute and attempt to execute a scheme and artifice to defraud
a financial institution, the deposits of which were then insured
by the Federal Deposit Insurance Corporation, and to obtain
moneys, funds, credits, assets, securities, and other property
owned by, and under the custody and control of, such financial
institution, by means of false and fraudulent pretenses,
representations, and promises, in violation of Title 18, United
States Code, Section 1344.

(Title 18, United States Code, Section 1349.)

COUNT TWO
(Conspiracy to Commit Money Laundering)
(Business Email Compromise)

3.    From at least in or about March 2019 up to and
including at least in or about May 2019, in the Southern
District of New York and elsewhere, JACOB SAGIAO, MARYLYNN
PENEUETA, BRITT JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE
OBIKA, NDUKWE ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR
AHAIWE, the defendants, and others known and unknown,
intentionally and knowingly did combine, conspire, confederate,
and agree together and with each other to commit money
laundering, in violation of Title 18, United States Code,
Section 1956(a)(1)(B)(i).

4.    It was a part and an object of the conspiracy
that JACOB SAGIAO, MARYLYNN PENEUETA, BRITT JACKSON, JOSHUA
FITTEN, DONTAE COTTRELL, ARINZE OBIKA, NDUKWE ANYAOGU, HERMAN
BASS, DAVID URO, and VICTOR AHAIWE, the defendants, and others
known and unknown, knowing that the property involved in certain
financial transactions represented the proceeds of some form of
unlawful activity, would and did conduct and attempt to conduct
such financial transactions which in fact involved the proceeds
of specified unlawful activity, to wit, wire fraud schemes
involving business email compromises, knowing that the
transactions were designed in whole and in part to conceal or

2

disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

<u>COUNT THREE</u>
(Aggravated Identity Theft)

5.   From at least in or about February 2019 up to and including at least in or about May 2019, in the Southern District of New York and elsewhere, VICTOR AHAIWE, the defendant, knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, AHAIWE controlled and transacted in a bank account of another person, who was deceased, including by using a debit card for that bank account, while holding himself out to be that other person, during and in relation to the bank fraud conspiracy alleged in Count One of this Complaint.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

<u>COUNT FOUR</u>
(Wire Fraud)
(Romance Fraud)

6.   From at least in or about June 2019 up to and including the present, in the Southern District of New York and elsewhere, BRITT JACKSON, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, JACKSON participated in and received proceeds from an online romance fraud, in which the victim was induced to send money to JACKSON based on false representations, and, in furtherance of such scheme, JACKSON caused an interstate wire to be sent from

Pennsylvania to Georgia, which wire was processed through a bank located in New York, New York.

(Title 18, United States Code, Sections 1343 and 2.)

### COUNT FIVE
(Wire Fraud)
(Fiji Fraud)

7.     From at least in or about October 2018 up to and including at least in or about October 2018, in the Southern District of New York and elsewhere, NDUKWE ANYAOGU, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, ANYAOGU participated in and received the proceeds from an email compromise scheme in which a law firm in Fiji was induced to send money to ANYAOGU based on false representations, and, in furtherance of such scheme, ANYAOGU caused an international wire to be sent from Fiji to Georgia, which wire was processed through a correspondent bank located in New York, New York.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

8.     I am a Task Force Officer with the United States Attorney's Office for the Southern District of New York and an Officer with U.S. Customs and Border Protection.  I have been personally involved in the investigation of this matter.  This affidavit is based upon my investigation, my conversations with law enforcement agents and others, and my examination of reports and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

<u>Overview</u>

9.      From at least in or about March 2019 up to and
including at least in or about May 2019, JACOB SAGIAO, MARYLYNN
PENEUETA, BRITT JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE
OBIKA, NDUKWE ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR
AHAIWE, the defendants, received, transferred, and sent the
proceeds of two business email compromise schemes (the "BEC
Schemes"), described further below, in which the victims (the
"Victims") were induced to send approximately $4.5 million to
bank accounts controlled by SAGIAO and OBIKA.  In order to
launder the proceeds of the BEC Schemes, the defendants created
bank accounts that listed "d/b/a" names that closely resembled
the names of real companies, so that transfers of proceeds
between and among those bank accounts would appear to be
transactions between real companies.

        a.    In the first BEC Scheme ("BEC-1"), a
technology company ("Victim-1") was induced to send
approximately $4 million to a bank account, which listed, as a
"d/b/a" of the accountholder, the name of an actual business
counterparty of Victim-1 ("Counterparty-1"), but which was
actually controlled by SAGIAO.  After SAGIAO received the
proceeds of BEC-1, SAGIAO transferred those proceeds, either
directly or through intermediaries, to bank accounts controlled
by PENEUETA, JACKSON, FITTEN, and COTTRELL, each of which
listed, as a "d/b/a" of the accountholder, a name that closely
resembled the name of a real company that the accountholder was
not affiliated with.

        b.    In the second BEC Scheme ("BEC-2"), a health
services organization ("Victim-2") was induced to send
approximately $500,000 to a bank account, which listed, as a
"d/b/a" of the accountholder, a name that closely resembled the
name of a food company ("Counterparty-2"), but which was
actually controlled by OBIKA.  After OBIKA received the proceeds
of BEC-2, OBIKA transferred those proceeds, either directly or
through intermediaries, to bank accounts controlled by SAGIAO,
FITTEN, URO, ANYAOGU, and BASS, each of which listed, as a
"d/b/a" of the accountholder, a name that closely resembled the
name of a real company that the accountholder was not affiliated
with.  Proceeds of BEC-2 were also sent to AHAIWE, who deposited
the funds in a bank account in the name of a deceased person
(the "Decedent") that AHAIWE controlled.

        10.   From at least in or about June 2019 up to and
including the present, BRITT JACKSON, the defendant,

                               5

participated in and received proceeds from an online romance fraud scheme, in which a man residing in Pennsylvania ("Victim-3") was induced to send over $130,000 based on false representations (the "Romance Fraud").

11. From at least in or about October 2018 up to and including at least in or about October 2018, NDUKWE ANYAOGU, the defendant, participated in and received approximately $380,000 in proceeds from an email compromise scheme involving a law firm in Fiji, which were intended for a woman residing in California ("Victim-4") (the "Fiji Fraud").

<u>BEC-1</u>

12. Based on my review of reports prepared by other law enforcement officers, including documents referenced in those reports and documents provided to me by Victim-1,[1] I have learned, among other things, the following:

a. Victim-1 is a Chinese technology company. Victim-1 regularly conducts business with Counterparty-1, which is a corporate affiliate of a major U.S. technology company.

b. On or about March 27, 2019, an employee of Victim-1 ("Employee-1") received an email purporting to be from an employee in the procurement department of Victim-1's parent company ("Employee-2"). This email--which was sent from the same email address that Employee-2 had previously used to correspond with Employee-1 about business--falsely stated that the payee information for Counterparty-1 had changed and that the new bank account for Counterparty-1 was a certain bank account purportedly held at a bank in New York, New York ("Phony Counterparty-1 Account").[2] In fact, Employee-2 did not send this email and was not aware of the email at the time it was sent.[3]

---

[1] Certain documents I have reviewed in the course of this investigation were originally written in Chinese. I have reviewed and relied upon English translations of those documents provided by Victim-1.

[2] Based on my review of bank records, I have learned that, in reality, Phony Counterparty-1 Account is held at a bank in California.

[3] Based on my training and experience, I believe that Employee-2's email account was hacked and that an attacker sent

c.    On or about April 1, 2019, Employee-2 sent an email to Employee-1 directing Employee-1 to make a payment of $4,088,412 to Counterparty-1 in connection with a business transaction.  This was a legitimate email from Employee-2.

d.    On or about April 2, 2019, Employee-1 wired $4,088,412 to Phony Counterparty-1 Account, in reliance on the March 27, 2019 email.

e.    On or about April 16, 2019, Counterparty-1 advised Victim-1 that Phony Counterparty-1 Account did not belong to Counterparty-1 or any of its corporate affiliates.

13.  Based on bank records and other documents and evidence that I have reviewed in the course of this investigation, including bank surveillance and certain open source materials, I have learned, among other things, the following:

a.    Phony Counterparty-1 Account was opened in person by JACOB SAGIAO, the defendant, on or about March 19, 2019, and lists, as a "d/b/a" of SAGIAO (the accountholder), a name that closely resembles the name of Counterparty-1, although, as discussed above, Phony Counterparty-1 Account did not belong to Counterparty-1 or any of its corporate affiliates.

b.    On or about April 5, 2019, after receiving the $4,088,412 wire transfer from Victim-1, SAGIAO sent a wire transfer in the amount of $1,000,000 from Phony Counterparty-1 Account to a bank account held at a bank in the United Kingdom (the "U.K. Account").  This wire transfer was processed through a correspondent bank located in New York, New York.

c.    On or about April 5, 2019, SAGIAO withdrew cashier's checks in the amounts of $250,000 and $290,000 from Phony Counterparty-1 Account.  Bank surveillance shows that SAGIAO was the person who withdrew the cashier's checks.[4]

---

the March 27, 2019 email to Employee-1 purporting to be from Employee-2.

[4]    In the course of this investigation, I have obtained a photograph of SAGIAO from records maintained by the California Department of Motor Vehicles.  Based on comparison with this

       d.   On or about April 8, 2019, the $250,000 cashier's check that SAGIAO withdrew from Phony Counterparty-1 Account was deposited into a certain bank account ("Bank Account-1").  Bank Account-1 was opened in person by BRITT JACKSON, the defendant, on or about October 23, 2018, and lists, as a "d/b/a" of JACKSON (the accountholder), a name that closely resembles the name of a real company ("Company-1").  The cashier's check deposited into Bank Account-1 was made payable to Company-1 and bank surveillance shows that JACKSON was the person who deposited the check.[5]

          i.   Company-1 is a Canadian company in the business of manufacturing tractors.  The transaction history in Bank Account-1 reflects no transactions that appear to relate to the legitimate business of Company-1.  After Bank Account-1 was opened on or about October 23, 2018, no transactions occurred until the deposit of $250,000 on or about April 8, 2019.

          ii.   JACKSON, who lives in Georgia, has no known connection to Company-1.  The corporate address listed for Company-1 in account opening documents for Bank Account-1 is JACKSON's own personal address, as reflected on his driver's license.  When JACKSON opened Bank Account-1, he described Company-1 as a sole proprietorship of which he was the owner, whereas the real Company-1 is a corporation.

          iii.   On or about May 2, 2019, after the $250,000 cashier's check was deposited into Bank Account-1, JACKSON sent a wire, in the amount of $237,500, from Bank Account-1 to a bank account held at a bank in China.

       e.   On or about April 8, 2019, the $290,000 cashier's check that SAGIAO withdrew from Phony Counterparty-1 Account was deposited into a certain bank account ("Bank Account-2").  Bank Account-2 was opened in person by MARYLYNN PENEUETA, the defendant, on or about March 15, 2019, and lists,

---

photograph, I believe that the person in the bank surveillance is SAGIAO.

[5]   In the course of this investigation, I have obtained a photograph of JACKSON from records maintained by the Georgia Department of Motor Vehicles.  Based on comparison with this photograph, I believe that the person in the bank surveillance is JACKSON.

as a "d/b/a" of PENEUETA (the accountholder), a name that closely resembles the name of a real company ("Company-2").  The cashier's check deposited into Bank Account-2 was made payable to Company-2.

        i.    Based on public social media posts and open source information, I have learned that PENEUETA is the wife or romantic partner of SAGIAO and that they reside together.

        ii.    Company-2 is a New York company in the business of manufacturing concrete products.  The transaction history in Bank Account-2 reflects no transactions that appear to relate to the legitimate business of Company-2.

        iii.    PENEUETA, who lives in California, has no known connection to Company-2.  The corporate address listed for Company-2 in the account opening documents for Bank Account-2 is PENEUETA's own personal address, as reflected on her driver's license.  When PENEUETA opened Bank Account-2, she described Company-2 as a sole proprietorship of which she was the owner, whereas the real Company-2 is a corporation.

        iv.    After the $290,000 cashier's check was deposited into Bank Account-2, on or about April 22, 2019, PENEUETA sent a wire, in the amount of $88,950, from Bank Account-2 to a bank account held at a bank in Canada.  On or about April 23, 2019, PENEUETA sent another wire, in the amount of $88,950, from Bank Account-2 to a bank account held at a bank in China.  Each of these wire transfers was processed through a correspondent bank located in New York, New York.

        f.    On or about April 22, 2019, after receiving the $290,000 cashier's check from SAGIAO, PENEUETA purchased the following five cashier's checks using funds from Bank Account-2:

        i.    A cashier's check in the amount of $16,000 ("PENEUETA Check-1");

        ii.    A cashier's check in the amount of $16,000 ("PENEUETA Check-2");

        iii.    A cashier's check in the amount of $15,615 ("PENEUETA Check-3");

        iv.    A cashier's check in the amount of $16,645 ("PENEUETA Check-4"); and

v.    A cashier's check in the amount of
$20,000 ("PENEUETA Check-5").

g.    On or about April 23, 2019, PENEUETA Check-1
and PENEUETA Check-2, totaling $32,000, were deposited into a
certain bank account ("Bank Account-3").  Bank Account-3 was
opened in person by DONTAE COTTRELL, the defendant, on or about
April 12, 2019, and lists, as a "d/b/a" of COTTRELL (the
accountholder), a name that closely resembles the name of a real
company ("Company-3").  Both PENEUETA Check-1 and PENEUETA
Check-2 were made payable to Company-3.  Account opening
documents show that COTTRELL's driver's license, bearing his
photograph, was provided to the bank at the time of account
opening.[6]

i.    Company-3 is a major California company
in the business of manufacturing power tools.  The transaction
history in Bank Account-3 reflects no transactions that appear
to relate to the legitimate business of Company-3.

ii.    COTTRELL, who lives in California, has
no known connection to Company-3.  The corporate address listed
for Company-3 in the account opening documents for Bank Account-
3 is COTTRELL's own personal address, as reflected on his
driver's license.  When COTTRELL opened Bank Account-3, he
described Company-3 as a sole proprietorship of which he was the
owner.

iii.    Between in or about April 23, 2019 and
April 26, 2019, COTTRELL made cash withdrawals in the total
amount of $32,000 from Bank Account-3.

h.    On or about April 26, 2019 and April 29,
2019, PENEUETA Check-3 and PENEUETA Check-4, respectively,
totaling $32,260, were deposited into a certain bank account
("Bank Account-4").  Bank Account-4 was opened in person by
JOSHUA FITTEN, the defendant, on or about March 21, 2019, and

---

[6]    Bank records for Bank Account-3 list the driver's license
number that was provided to the bank at the time of account
opening.  In the course of this investigation, I have obtained a
photograph of COTTRELL, maintained by the California Department
of Motor Vehicles, linked to the same driver's license number.
The photograph on the driver's license matches a photograph that
COTTRELL submitted as part of a passport application in 2012.

lists, as a "d/b/a" of FITTEN (the accountholder), a name that closely resembles the name of a real company ("Company-4"). Both PENEUETA Check-3 and PENEUETA Check-4 were made payable to Company-4.  Account opening documents show that FITTEN's driver's license, bearing his photograph, was provided to the bank at the time of account opening.[7]

        i.    Company-4 is a Taiwanese company in the business of manufacturing hand tools and industrial hardware. The transaction history in Bank Account-4 reflects no transactions that appear to relate to the legitimate business of Company-4.

        ii.   FITTEN, who lives in California, has no known connection to Company-4.  The corporate address listed for Company-4 in account opening documents for Bank Account-4 is FITTEN's own personal address, as reflected on his credit reports.  When FITTEN opened Bank Account-4, he described Company-4 as a sole proprietorship of which he was the owner, whereas the real Company-4 is a corporation.

        iii.  Between April 26, 2019 and April 30, 2019, FITTEN made cash withdrawals in the total amount of $32,800 from Bank Account-4.

        i.    On or about April 22, 2019, PENEUETA Check-5, in the amount of $20,000, was deposited into a certain bank account ("Bank Account-5").  Bank Account-5 was opened in person by JACOB SAGIAO, the defendant, on or about January 31, 2019, and lists, as a "d/b/a" of SAGIAO (the accountholder), a name that closely resembles the name of a real company ("Company-5"). PENEUETA Check-5 was made payable to Company-5.

---

[7]    Bank records for Bank Account-4 list the driver's license number that was provided to the bank at the time of account opening.  As described further below in paragraph 16(f), the same driver's license number was provided when FITTEN opened another account, Bank Account-8 (as defined below).  Bank records for Bank Account-8 include a photocopy of that driver's license, which includes a photograph of FITTEN.  Furthermore, FITTEN provided the same phone number for both Bank Account-4 and Bank Account-8.  Based on telephone subscriber records I have reviewed in the course of this investigation, the subscriber of that phone number is FITTEN.

     i. Company-5 is a Serbian company in the military defense business.  The transaction history in Bank Account-5 reflects no transactions that appear to relate to the legitimate business of Company-5.

     ii. SAGIAO, who lives in California, has no known connection to Company-5.  The corporate address listed for Company-5 in account opening documents for Bank Account-5 is SAGIAO's own personal address, as reflected on his driver's license.  When SAGIAO opened Bank Account-5, he described Company-5 as a sole proprietorship of which he was the owner, whereas the real Company-5 is a corporation.

     iii. On or about May 1, 2019, SAGIAO made a cash withdrawal in the amount of $14,000 from Bank Account-5.

<u>BEC-2</u>

  14. Based on my discussions with other law enforcement officers and my review of reports prepared by other law enforcement officers, I have learned, among other things, the following:

    a. Victim-2 is a health services organization in Sint Maarten.

    b. On or about March 4, 2019, Victim-2's finance department received an email from the email account of the Chief Financial Officer of Victim-2 (the "CFO") directing a $500,000 wire transfer to a certain bank account in Brooklyn, New York ("Phony Counterparty-2 Account") for the benefit of Counterparty-2, which is a real company.  In fact, the CFO did not send this email and was not aware of this email at the time it was sent.

    c. On or about March 6, 2019, Victim-2's finance department wired $499,900 ($500,000 minus a $100 wire fee) to Phony Counterparty-2 Account, in reliance on the March 4, 2019 email.  This wire transfer was processed through a correspondent bank located in New York, New York.

    d. On or about March 11, 2019, the CFO was alerted to the wire transfer and learned that his email account had been compromised.

  15. Based on my discussion with a representative of Counterpary-2, I have learned, among other things, that Phony

Counterparty-2 Account did not belong to Counterparty-2 or any of its corporate affiliates.

16. Based on bank records and other documents and evidence that I have reviewed in the course of this investigation, including bank surveillance and certain open source materials, I have learned, among other things, the following:

a. Phony Counterparty-2 Account was opened in person by ARINZE OBIKA, the defendant, on or about November 16, 2018, and lists, as a "d/b/a" of OBIKA (the accountholder), a name that closely resembles the name of Counterparty-2, although, as discussed above, Phony Counterparty-2 Account did not belong to Counterparty-2 or any of its corporate affiliates. Account opening documents show that OBIKA's driver's license, bearing his photograph, was provided to the bank at the time of account opening.[8]

b. On or about March 8, 2019, after receiving the $499,900 wire transfer from Victim-2, OBIKA withdrew $485,974 from Phony Counterparty-2 Account and purchased the following five cashier's checks:

i. A cashier's check in the amount of $50,988 ("OBIKA Check-1");

ii. A cashier's check in the amount of $34,993 ("OBIKA Check-2");

iii. A cashier's check in the amount of $34,993 ("OBIKA Check-3");

iv. A cashier's check in the amount of $196,000 ("OBIKA Check-4"); and

v. A cashier's check in the amount of $169,000 ("OBIKA Check-5").

c. Between on or about March 8, 2019 and March 11, 2019, OBIKA made cash withdrawals in the total amount of $13,800 from Phony Counterparty-2 Account.

---

[8] A photocopy of OBIKA's driver's license was maintained in the bank records for Phony Counterparty-2 Account.

13

d.      On or about March 8, 2019, OBIKA Check-1, in the amount of $50,988, was deposited into a certain bank account ("Bank Account-6").  Bank Account-6 was opened in person by DAVID URO, the defendant, on or about December 11, 2018, and lists, as a "d/b/a" of URO (the accountholder), a name that closely resembles the name of a real company ("Company-6"). OBIKA Check-1 was made payable to Company-6.  Account opening documents show that URO's Nigerian passport and United States Permanent Resident card, both bearing his photograph, were provided to the bank at the time of account opening.[9]

i.      Company-6 is a British company in the commercial aerospace, defense, and security businesses.  The transaction history in Bank Account-6 reflects no transactions that appear to relate to the legitimate business of Company-6.

ii.     URO, who lives in New York, has no known connection to Company-6.  The corporate address listed for Company-6 in account opening documents for Bank Account-6 is URO's own personal address, as reflected on his driver's license.  This same address was listed by ARINZE OBIKA, the defendant, as the address for the accountholder of Phony Counterparty-2 Account.  When URO opened Bank Account-6, he described Company-6 as a sole proprietorship of which he was the owner, whereas the real Company-6 is a corporation.

iii.    Between in or about March 12, 2019 and March 13, 2019, URO made cash withdrawals in the total amount of $24,000 from Bank Account-8.

e.      On or about March 11, 2019, OBIKA Check-2, in the amount of $34,993, was deposited into a certain bank account ("Bank Account-7").  Bank Account-7 was opened in person by JACOB SAGIAO, the defendant, on or about February 28, 2019, and lists, as a "d/b/a" of SAGIAO (the accountholder), a name that closely resembles the name of a real company ("Company-7"). OBIKA Check-2 was made payable to Company-7.  Account opening documents show that SAGIAO's driver's license, bearing his

---

[9]      Photocopies of the Nigerian passport and Permanent Resident card were maintained in the bank records for Bank Account-6.

photograph, and his Social Security Card were provided to the
bank at the time of account opening.[10]

          i.    Company-7 is a Dutch company that
appears to be in the zoo logistics business.  The transaction
history in Bank Account-7 reflects no transactions that appear
to relate to the legitimate business of Company-7.

          ii.    SAGIAO, who lives in California, has no
known connection to Company-7.  The corporate address listed for
Company-7 in the account opening documents for Bank Account-7 is
SAGIAO's own personal address, as reflected on his driver's
license.  When SAGIAO opened Bank Account-7, he described
Company-7 as a sole proprietorship of which he was the owner,
whereas the real Company-7 is a corporation.

          iii.    On or about March 12, 2019, SAGIAO made
cash withdrawals in the total amount of $34,000 from Bank
Account-7.

          f.    On or about March 11, 2019, OBIKA Check-3,
in the amount of $34,993, was deposited into a certain bank
account ("Bank Account-8").  Bank Account-8 was opened in person
by JOSHUA FITTEN, the defendant, on or about January 9, 2019,
and lists, as a "d/b/a" of FITTEN (the accountholder), a name
that closely resembles the name of a real company ("Company-8").
OBIKA Check-3 was made payable to Company-8.  Account opening
documents show that FITTEN's driver's license, bearing his
photograph, and his Social Security Card were provided to the
bank at the time of account opening.[11]

          i.    According to records maintained by the
British government, Company-8 is a British company that was
dissolved in or about October 2016 and then re-formed in or
about March 12, 2019.  The transaction history in Bank Account-8
reflects no transactions that appear to relate to the legitimate
business of Company-8.

---

[10]    Photocopies of SAGIAO's driver's license and Social
Security Card were maintained in the bank records for Bank
Account-7.

[11]    Photocopies of FITTEN's driver's license and Social
Security Card were maintained in the bank records for Bank
Account-8.

        ii.    FITTEN, who lives in California, has no known connection to Company-8.  The corporate address listed for Company-8 in the account opening documents for Bank Account-8 is FITTEN's own personal address, as reflected on his credit reports.

        iii.    On or about March 11, 2019, the same day that OBIKA Check-3, in the amount of $34,993, was deposited into Bank Account-8, FITTEN made a cash withdrawal in the amount of $34,400 from Bank Account-8.

        g.    On or about March 11, 2019, OBIKA Check-4, in the amount of $196,000 was deposited into a certain bank account ("Bank Account-9").  Bank Account-9 was opened in person by NDUKWE ANYAOGU, the defendant, on or about December 27, 2019, and lists, as a "d/b/a" of ANYAOGU (the accountholder), the name of a shell company ("Company-9").  OBIKA Check-4 was made payable to Company-9.  Account opening documents show that ANYAOGU's driver's license, bearing his photograph, was provided to the bank at the time of account opening.[12]

        i.    Company-9 was organized by ANYAOGU as a Georgia LLC in or about August 22, 2018.  Based on my review of open source material and public databases, Company-9 conducts no real business.  The corporate address listed for Company-9 in account opening documents for Bank Account-9 for Company-9 is ANYAOGU's own personal address, as reflected on his driver's license.  The building at that address is a residential apartment building.

        ii.    On or about March 20, 2019, ANYAOGU attempted to wire $191,500 from Bank Account-9 to the U.K. Account, which is the same account to which JACOB SAGIAO, the defendant, wired $1,000,000 of the proceeds of BEC-1, as described above in paragraph 13(b).  The requested wire transfer was declined by the bank where Bank Account-9 was held.  On or about March 21, 2019, ANYAOGU withdrew the balance of Bank Account-9, in the amount of $193,539.85, as a cashier's check made out to Company-9.

        h.    On or about March 14, 2019, OBIKA Check-5, in the amount of $169,000, was deposited into a certain bank account ("Bank Account-10").  Bank Account-10 was opened in

---

[12]    A photocopy of ANYAOGU's driver's license was maintained in the bank records for Bank Account-9.

person by HERMAN BASS, the defendant, on or about March 14, 2019, and lists, as a "d/b/a" of BASS (the accountholder), a name that closely resembles the name of a real company ("Company-10").  OBIKA Check-5 was made payable to Company-10.

   i. Company-10 is a California company in the business of valve engineering and manufacturing.  The transaction history in Bank Account-10 reflects no transactions that appear to relate to the legitimate business of Company-10.

   ii. BASS, who lives in California, has no known connection to Company-10.  The corporate address for Company-10 listed in the account opening documents for Bank Account-10 is not the address listed on the real Company-10's website as Company-10's corporate address.  When BASS opened Bank Account-10, he described Company-10 as a sole proprietorship of which he was the owner.

   iii. On or about March 23, 2019 and March 25, 2019, BASS wrote two personal checks from Bank Account-10 made payable to the Decedent, a person who, according to public records, died on or about January 3, 2019 (the "Decedent Checks").  Bank surveillance shows BASS accessing Bank Account-10 at a teller window on or about March 26, 2019.[13]

   i. On or about March 25 and 26, 2019, the Decedent Checks, totaling $100,000, were deposited into a certain bank account in the name of the Decedent ("Bank Account-11").  On or about April 5, 2019, a check in the amount of $27,250 drawn on Bank Account-11 was deposited at another bank account in the name of the Decedent ("Bank Account-12").  For the following reasons, I believe that, at the time the $27,250 check was deposited, Bank Account-12 was under the control of VICTOR AHAIWE, the defendant:

   i. AHAIWE also maintained an account in his own name (the "AHAIWE Account") at the same bank where Bank Account-12 is held.

---

[13] In the course of this investigation, I have obtained a photograph of BASS from records maintained by the California Department of Motor Vehicles.  Based on comparison with this photograph, I believe that the person in the bank surveillance is BASS.

ii.    The address listed for the Decedent in Bank Account-12 is the same as the address listed for AHAIWE in the AHAIWE Account.  Based on my review of phone subscriber records, I have learned that the phone number listed for the Decedent on Bank Account-12 is subscribed to AHAIWE's home address.  Based on my review of email subscriber records, I have learned that the subscriber of the email account listed for the Decedent on Bank Account-12 is AHAIWE.

iii.    Bank surveillance shows that, on or about March 6, 2019, AHAIWE accessed Bank Account-12 from an ATM.[14]  Bank records show that AHAIWE used the debit card for Bank Account-12, in the name of the Decedent, in order to access the ATM.

<u>Online Romance Fraud</u>

17.  Based on my discussions with Victim-3 and documents provided to me by Victim-3, along with certain open source materials, I have learned, among other things, the following:

a.    Victim-3 resides in Pennsylvania.

b.    In or about June 2019, Victim-3 met an individual who identified himself as "Joseph Cordoba" on an online dating website.  After initially meeting on the website, Victim-3 and "Joseph Cordoba" continued their communications through email and by phone.

c.    In the course of communications with Victim-3, "Joseph Cordoba" stated, in sum and substance, that he owned an interior design business (the "Phony Design Business") in Connecticut.  Based on my review of open source and law enforcement databases, the Phony Design Business does not exist.

d.    In the course of email communications with Victim-3, "Joseph Cordoba" purported to live at an address in Connecticut.  Based on my review of open source material, that address does not exist.

---

[14]    In the course of this investigation, I have obtained a photograph of AHAIWE from records maintained by the California Department of Motor Vehicles.  Based on comparison with this photograph, I believe that the person in the bank surveillance is AHAIWE.

e.    In or about July 2019, "Joseph Cordoba" called Victim-3 and stated, in sum and substance, that he needed to pay import taxes on furniture for the Phony Design Business to an importer (the "Phony Importer").  In reliance on this representation and subsequent phone and email communications with "Joseph Cordoba," on or about July 11, 2019, Victim-3 mailed a $10,000 check payable to the Phony Importer, addressed to BRITT JACKSON, the defendant.  "Joseph Cordoba" had previously described JACKSON as a representative of the Phony Importer.

f.    In or about July 2019, "Joseph Cordoba," in phone and email communications, told Victim-3, in sum and substance, that he needed money to pay for the shipping of furniture from the Phony Importer to the Phony Design Business. "Joseph Cordoba" agreed to treat as a loan any money that Victim-3 sent for this purpose, and "Joseph Cordoba" executed a promissory note.  In reliance on these representations, Victim-3 initiated the following wires:

i.    On or about July 16, 2019, Victim-3 wired $16,500 to JACKSON at a bank account in Georgia provided by "Joseph Cordoba" ("Bank Account-13").  This wire was processed through a bank located in New York, New York.

ii.    On or about July 24, 2019, Victim-3 wired an additional $30,000 to JACKSON at Bank Account-13.  This wire was processed through a bank located in New York, New York.

g.    In or about August 2019, "Joseph Cordoba," in phone and email communications, told Victim-3, in sum and substance, that he needed money to pay for fees related to the estate of the father of "Joseph Cordoba," which "Joseph Cordoba" claimed was worth millions of U.S. dollars.  "Joseph Cordoba" agreed to treat as a loan any money that Victim-3 sent for this purpose, and "Joseph Cordoba" executed a promissory note.  In reliance on these communications, on or about August 21, 2019, Victim-3 wired $80,000 to a bank account in Hong Kong, China.

h.    In or about the summer of 2019, "Joseph Cordoba" and Victim-3 made plans to meet for a date in Manhattan.  In anticipation of that meeting, Victim-3 made travel arrangements, including a hotel reservation.  Shortly before the planned meeting, "Joseph Cordoba" cancelled.  Victim-3 has never seen "Joseph Cordoba" in person.

19

i.    "Joseph Cordoba" has not repaid any of the promissory notes that he executed in order to induce Victim-3 to send money.

j.    "Joseph Cordoba" continues to communicate with Victim-3 through the present.

18.    Based on bank records and other documents and evidence that I have reviewed in the course of this investigation, including bank surveillance, I have learned, among other things, the following:

a.    Bank Account-13 was opened in person in or about November 19, 2018 by BRITT JACKSON, the defendant.

b.    On or about July 16, 2019, the same day that Victim-3 wired $16,500 to Bank Account-13, JACKSON withdrew cash from Bank Account-13 at an ATM.  Bank surveillance shows that JACKSON was the person who accessed the ATM.[15]

c.    On or about July 18, 2019, JACKSON withdrew $17,200 from Bank Account-13 in the form of a cashier's check. Bank surveillance shows that JACKSON withdrew the funds at a teller window.

d.    On or about July 26, 2019--shortly after receiving the $30,000 wire from Victim-3 on or about July 24, 2019--JACKSON wired $23,965 to a bank account held at a bank in Canada, which is the same bank account that, on or about April 22, 2019, received a $88,950 wire from MARYLYNN PENEUETA, the defendant, in connection with BEC-1, as described above in paragraph 13(e)(iv).

<u>Fiji Fraud</u>

19.    Based on my discussions with other law enforcement officers and my review of reports prepared by other law enforcement officers, I have learned, among other things, the following:

---

[15]    In the course of this investigation, I have obtained a photograph of JACKSON from records maintained by the Georgia Department of Motor Vehicles.  Based on comparison with this photograph, I believe that the person in the bank surveillance is JACKSON.

a.   In or about 2018, Victim-4, a woman who resides in California, was the intended beneficiary of certain proceeds from the sale of land in Fiji (the "Estate Proceeds"). A law firm in Fiji ("the Fiji Firm") was responsible for sending the Estate Proceeds--which were in the total approximate amount of $380,000--to Victim-4.

b.   On or about October 2, 2018, the Fiji Firm received an email purportedly sent by Victim-4's daughter (who had authority to handle Victim-4's affairs with the Fiji Firm), directing the Fiji Firm to send the Estate Proceeds to a certain bank account in Georgia ("Bank Account-14").  In fact, the email was sent by a third-party, and Bank Account-14 did not belong to Victim-4.  The October 2, 2018 email listed, as the address for the accountholder of Bank Account-14, the home address of NDUKWE ANYAOGU, the defendant.

c.   One or about October 4, 2018 and October 9, 2019, the Fiji Firm sent the Estate Proceeds, by two wire transfers, each in the approximate amount of $194,000, to Bank Account-14.

20.   Based on bank records and other documents and evidence that I have reviewed in the course of this investigation, I have learned, among other things, the following:

a.   The two wire transfers from the Fiji Firm to Bank Account-14 were processed through a correspondent bank located in New York, New York.

b.   Bank Account-14 was opened in person by NDUKWE ANYAOGU, the defendant, on or about October 1, 2018, and lists, as a "d/b/a" of ANYAOGU (the accountholder), the name of Victim-4.  The phone number and email address listed on Bank Account-14 are ANYAOGU's phone number and email address. Account opening documents show that ANYAOGU's driver's license, bearing his photograph, was provided to the bank at the time of account opening.[16]

---

[16]   Bank records for Bank Account-14 list the driver's license number that was provided to the bank at the time of account opening.  As described above at paragraph 16(g), the same driver's license number was provided when ANYAOGU opened another account, Bank Account-9.  Bank records for Bank Account-9

      c.   After Bank Account-14 received the two wires intended for Victim-4 from the Fiji Firm, ANYAOGU withdrew cashier's checks and initiated international wire transfers from Bank Account-14.  For example:

      i.   On or about October 5, 2018, ANYAOGU withdrew $40,000 from Bank Account-14 in the form of a cashier's check payable to another person.  Also on or about October 5, 2018, ANYAOGU wired $97,000 from Bank Account-14 to a bank account held at a bank in Turkey.  This wire was processed through a correspondent bank in New York, New York.

      ii.   On or about October 12, 2018, ANYAOGU withdrew funds from Bank Account-14 to fund a $50,000 cashier's check to another entity controlled by ANYAOGU and a $40,000 cashier's check to another person.  Also on October 12, 2018, ANYAOGU sent two international wires, in the amounts of $194,000 and $10,000 from Bank Account-14 to bank accounts held at banks outside of the United States.  Each of these international wires was processed through a correspondent bank located in New York, New York.

    21.   Based on my review of bank records and publicly available documents, I have learned that each of the banks where Phony Counterparty-1 Account, Phony Counterparty-2 Account, Bank Account-1, Bank Account-2, Bank Account-3, Bank Account-4, Bank Account-5, Bank Account-6, Bank Account-7, Bank Account-8, Bank Account-9, Bank Account-10, Bank Account-11, Bank Account-12, Bank Account-13, Bank Account-14, and the AHAIWE Account were opened is insured by the Federal Deposit Insurance Corporation.

    22.   Based on my training and experience, individuals who engage in criminal activity--including wire fraud schemes like BEC-1, BEC-2, the Romance Fraud, and the Fiji Fraud--often take steps to conceal the source of proceeds of that criminal activity, that is, to launder the proceeds.  The methods used to launder such criminal proceeds can include, as relevant here, creating new bank accounts in the names of entities and transferring money between those accounts as cash or as cashier's checks.  In cases where the underlying criminal activity occurred outside the United States but the proceeds are

---

include a photocopy of that driver's license, which contains a photograph of ANYAOGU.

sent to the United States to be laundered, the proceeds are
frequently sent back overseas after they have been laundered.

       WHEREFORE, I respectfully request that warrants be
issued for the arrests of JACOB SAGIAO, MARYLYNN PENEUETA, BRITT
JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE OBIKA, NDUKWE
ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR AHAIWE, the
defendants, and that they be arrested, and imprisoned or bailed,
as the case may be.


_____
JARED EANNUCCI
Task Force Officer
United States Attorney's Office for the
Southern District of New York


Sworn to before me this
11 day of February, 2020

_____
THE HONORABLE ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

# EXHIBIT B

Approved: _____
        JUN XIANG / KEVIN MEAD
        Assistant United States Attorneys

Before:  THE HONORABLE SARAH L. CAVE
        United States Magistrate Judge
        Southern District of New York

- - - - - - - - - - - - - - - - X
                      :

UNITED STATES OF AMERICA    :    SEALED COMPLAINT
                      :

    - v. -             :    Violations of
                      :    18 U.S.C. §§ 1001,
PRINCE UKO,            :    1956(h), and 2
                      :

             Defendant.   :    COUNTY OF OFFENSE:
                      :    NEW YORK
- - - - - - - - - - - - - - - - X


SOUTHERN DISTRICT OF NEW YORK, ss.:

     TABATHA IALACCI, being duly sworn, deposes and says that she is a Special Agent with the United States Secret Service, and charges as follows:

<u>COUNT ONE</u>
(Conspiracy to Commit Money Laundering)

     1.   From at least in or about July 2018 up to and including at least in or about November 2019, in the Southern District of New York and elsewhere, PRINCE UKO, the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

     2.   It was a part and an object of the conspiracy that PRINCE UKO, the defendant, and others known and unknown, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, wire fraud schemes involving business email compromises, knowing that the transactions were designed in whole and in part to conceal or

1

disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

## COUNT TWO
### (False Statements)

3. From in or about February 28, 2020 up to and including at least in or about February 29, 2020, in the Southern District of New York and elsewhere, PRINCE UKO, the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully did make materially false, fictitious, and fraudulent statements and representations, to wit, during an interview with a Special Agent from the Federal Bureau of Investigation and an investigator with the United States Attorney's Office for the Southern District of New York, UKO falsely stated, in sum and substance, that he had never exchanged text communications with another person ("CC-1") regarding the receipt or sending of money from bank accounts and that certain transactions in bank accounts controlled by UKO were for a textile business, when in truth and in fact, UKO was aware that he had sent CC-1 text communications with instructions to engage in certain bank transactions and that the transactions in the bank accounts controlled by UKO were the proceeds of criminal activity.

(Title 18, United States Code, Sections 1001 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

4. I am a Special Agent of the United States Secret Service, currently assigned to the New York Electronic Task Force. I have been personally involved in the investigation of this matter. This affidavit is based upon my investigation, my conversations with law enforcement agents and others, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

2

Overview

5.    From at least in or about July 2018 up to and
including in or about November 2019, PRINCE UKO, the defendant,
participated in a money laundering operation (the
"ML Operation"), which received the proceeds of various business
email compromise wire fraud schemes ("BEC Schemes") and caused
those proceeds to be transferred through financial transactions
designed to conceal the source of the proceeds.  UKO's role in
the ML Operation included personally engaging in financial
transactions, using bank accounts that UKO controlled, to
conceal the source of proceeds and directing co-conspirators--
including two co-conspirators not named as defendants herein
("CC-1" and "CC-2")--to engage in financial transactions in
their own bank accounts.

6.    One of the BEC Schemes the proceeds of which were
laundered by UKO and the ML Operation is a business email
compromise scheme (the "IGO Scheme") in which the victim is an
international intergovernmental organization headquartered in
New York, New York (the "IGO").  Due to the compromise of an
email account, on or about July 23 and July 31, 2018, the IGO
sent two wires, in the total approximate amount of $340,000, to
a bank account that that the IGO believed to belong to a
counterparty (the "IGO Counterparty"), but that in fact belonged
to a member of the ML Operation.  Approximately $147,000 of
those proceeds were then deposited into a bank account
controlled by UKO.

7.    On or about February 27, 2020, law enforcement
officers arrested eight individuals, including CC-1, for
criminal offenses that included conspiracy to commit money
laundering, in violation of 18 U.S.C. § 1956(h).  The Complaint
upon which those arrests were made ("the February 11
Complaint"), dated February 11, 2020, and sworn before the
Honorable Robert W. Lehrburger, United States Magistrate Judge,
is attached as Exhibit A and incorporated by reference herein.

a.    Following CC-1's arrest, in an interview
with law enforcement officers on or about February 27, 2020, CC-
1 stated, in sum and substance, that he engaged in money
laundering transactions at the direction of PRINCE UKO, the
defendant, and another co-conspirator not named as a defendant
herein ("CC-3").  CC-1 stated that UKO and CC-3 provided these
instructions on phone calls and in text communications with CC-
1.

3

b.    CC-1 consented to a search of his cell phone (the "CC-1 Phone") and showed law enforcement officers text communications from UKO and CC-3, in which UKO and CC-3 directed CC-1 to engage in specific financial transactions involving the proceeds of BEC Schemes.  The CC-1 Phone also contained logs of phone calls between UKO and CC-1, and between CC-3 and CC-1.

8.    On or about February 28, 2020, law enforcement officers interviewed UKO at his home regarding his involvement in the ML Operation.

a.    During the interview, law enforcement officers asked UKO about specific financial transactions, involving bank accounts under UKO's control, of proceeds of BEC Schemes.  In response, UKO falsely stated, in sum and substance, that the financial transactions were legitimate business transactions relating to a textile business.

b.    During the interview, law enforcement officers also asked UKO about his relationship with CC-1.  In response, UKO falsely stated, in sum and substance, that he did not exchange electronic communications with CC-1 regarding the receipt or sending of money from bank accounts.

<u>IGO BEC</u>

9.    Based on my review of reports prepared by other law enforcement officers, including documents referenced in those reports and documents provided to me by the IGO, I have learned, among other things, the following:

a.    The IGO is an international intergovernmental organization headquartered in New York, New York.  The IGO regularly conducts business with a certain entity (the "IGO Counterparty").

b.    In or about July, 2018, the IGO received an email purporting to be from the IGO Counterparty requesting that payments be made to a certain bank account that the email represented belonged to the IGO Counterparty ("Phony IGO Counterparty Account").

c.    On or about July 23, 2018, the IGO wired $169,084.80 to the Phony IGO Counterparty Account, in reliance on the email purportedly from the IGO Counterparty.

   d. On or about July 31, 2018, the IGO wired $168,269.48 to the Phony IGO Counterparty Account, in reliance on the email purportedly from the IGO Counterparty.

   e. The Phony IGO Counterparty Account does not in fact belong to the IGO Counterparty.

   10. Based on bank records and other documents I have reviewed in the course of this investigation, including bank surveillance, I have learned, among other things, the following about Phony IGO Counterparty Account and the transactions that account was involved in after receiving the two wires from the IGO:

   a. Phony Counterparty-1 Account was opened by a person referred to herein as CC-2.

   b. Shortly after receiving the first wire from the IGO, on or about July 24, 2018, an official check was made out from the Phony IGO Counterparty Account in the amount of $147,192 to a certain entity (the "UKO Entity").

   11. On or about August 15, 2019, law enforcement officers spoke to CC-2.  CC-2 stated, in sum and substance, that an individual had come to him and asked him to open the Phony IGO Counterparty Account in the name it was opened in.

   12. Based on bank records and other documents I have reviewed in the course of this investigation, I have learned, among other things, the following about the check made out to the UKO Entity and the account it was deposited into:

   a. On or about July 24, 2018, the check for $147,192 was deposited into a bank account held in the name of "Prince K. Uko, d/b/a [the UKO Entity]" (the "UKO Entity Account").

   b. As described below, PRINCE UKO, the defendant, confirmed during an interview with law enforcement officers on or about February 28, 2020, that he controlled the UKO Entity.

   13. Based on bank records and other documents I have reviewed in the course of this investigation, I have learned the following about transactions made by the UKO Entity Account shortly after receiving the $147,192 check:

a.    On or about August 2, 2018, an $80,050 wire was sent from the UKO Entity Account to a bank account in China. I know from my involvement in the investigation that this is the same bank account in China that received a wire in the amount of $237,500, as described in the February 11 Complaint at paragraph 13(d)(3), which were proceeds traceable to BEC-1.  (Ex. A. ¶ 13(d)(3)(iii).)

b.    Three transfers were made from the UKO Entity Account to a bank account with the name "Uko P. Everyday Checking":

i.    On August 1, 2018, $1,500 was transferred from the UKO Entity Account to the "Uko P. Everyday Checking" account.

ii.    On August 2, 2018, $2,000 was transferred from the UKO Entity Account to the "Uko P. Everyday Checking" account.

iii.    On September 17, 2018, $8 was transferred from the UKO Entity Account to the "Uko P. Everyday Checking" account.

c.    On or about August 2, 2018, a $17,150 transfer was made from the UKO Entity Account to an account called "Prince K. Uko Business Checking."

d.    On or about August 3, 2018, $37,912 was transferred from the UKO Entity Account by wire to another bank account in California.

14.  Based on my review of law enforcement reports, I know that on or about November 1, 2018, law enforcement officers conducted a voluntary interview of PRINCE UKO, the defendant. During the course of that interview, the following occurred:

a.    With respect to a money laundering scheme not charged herein, UKO stated, in sum and substance, the following:

i.    An individual (the "Purported Person") told UKO to open a business and to open a bank account in that business's name.

ii.    UKO began receiving wires into that bank account from individuals he did not know.

    iii.  The Purported Person told UKO where to send the money once he had received it, and told UKO to keep five percent of the money he had received.

    iv.  UKO stated that he was not aware there was anything fraudulent about the activity.

   b. On or about November 1, 2018, law enforcement officers also gave UKO a letter about that unrelated money laundering scheme (the "November 1 Letter"):

    i.  The November 1 Letter warned UKO, in sum and substance, that "under certain circumstances, knowingly engaging in a financial transaction that involves funds derived from illegal activity may violate the federal money laundering laws, even if you had no involvement in the underlying criminal activity."

    ii.  The November 1 Letter further warned UKO, in sum and substance, that "receipt of this letter will be taken into consideration, should continue to be involved in the type of activities described above."

    iii.  UKO signed the November 1 Letter to acknowledge his receipt of it.

<u>February 11 Complaint and BEC-1</u>

   15. Based on my discussion with other law enforcement officers, my review of reports prepared by other law enforcement officers, and my review of the February 11 Complaint, I have learned, among other things, the following:

   a. As set forth in greater detail in the February 11 Complaint, CC-1 participated in a money laundering conspiracy to, among other things, conceal the source of proceeds of a business email compromise scheme identified in the February 11 Complaint as "BEC-1."

   b. As set forth in greater detail in the February 11 Complaint:

    i.  An employee at a Chinese technology company ("Victim-1" in the February 11 Complaint) received an email purporting to be from an employee of the parent company of Victim-1.  (Ex. A ¶¶ 12(a)-(b).)  The email falsely stated that

7

the payment information for a certain counterparty
("Counterparty-1" in the February 11 Complaint) had changed.
(Id. ¶ 12(b).)  In reliance on that false information, on or
about April 2, 2019, Victim-1 wired $4,088,412 to an account
that Victim-1 believed belonged to Counterparty-1, but that did
not in fact belong to Counterparty-1 (the "Phony Counterparty-1
Account" in the February 11 Complaint).  (Id. ¶¶ 12(c)-(e).)

       ii.    The Phony Counterparty-1 Account had in
fact been opened by Jacob Sagiao, one of the individuals charged
in the Feb. 11 Complaint.  (Id. ¶ 13(a).)

       iii.    On or about April 5, 2019, after
receiving the $4,088,412 wire transfer from Victim-1, Sagiao
sent a wire transfer in the amount of $1,000,000 from the Phony
Counterparty-1 Account to a bank account held at a bank in the
United Kingdom (the "U.K. Account" in the February 11
Complaint).  This wire transfer was processed through a
correspondent bank located in New York, New York.  (Id.
¶ 13(b).)

       iv.    On or about April 5, 2019, Sagiao also
withdrew a cashier's check in the amount of $250,000 from Phony
Counterparty-1 Account, made payable to the name of a company
("Company-1" in the February 11 Complaint).  On or about April
8, 2019, that $250,000 cashier's check was deposited into a
certain bank account ("Bank Account-1" in the February 11
Complaint).  Bank Account-1 was opened in person by CC-1 on or
about October 23, 2018, and lists, as a "d/b/a" of CC-1 (the
accountholder), a name that closely resembles the name of
Company-1.  CC-1 has no connection to the real Company-1.  (Id.
¶ 13(c)-(d).)

       v.    On or about May 2, 2019, after the
$250,000 cashier's check was deposited into Bank Account-1, CC-1
sent a wire, in the amount of $237,500, from Bank Account-1 to a
bank account held at a bank in China.  (Id. ¶ 13(d)(iii).)

<u>CC-1's February 27, 2020 Post-Arrest Interview</u>

16.  Based on my discussions with other law
enforcement officers and my review of reports prepared by other
law enforcement officers, I have learned, among other things,
the following:

a.    On or about February 27, 2020, CC-1 was arrested in Georgia pursuant to an arrest warrant signed by Judge Lehrburger based on the February 11 Complaint.

b.    Following the arrest, CC-1 was advised of his <u>Miranda</u> rights, waived those rights, and agreed to speak with law enforcement officers.

c.    During CC-1's post-arrest interview with law enforcement officers, CC-1 stated, in sum and substance, the following:

i.    CC-1 stated that he been involved in multiple schemes in which he received large amounts of money by check or wire and then in turn transferred most of that money to other individuals.  CC-1 stated that he usually did not know the individuals and companies he was receiving money from and sending money to, and that the transfers were not made for any legitimate purpose.

ii.    CC-1 further stated that he was directed to engage in the financial transactions described above by PRINCE UKO, the defendant, and CC-3.  CC-1 stated that he communicated with UKO and CC-3 through phone calls and text messages on the messaging application WhatsApp.

iii.    CC-1 further stated that UKO and CC-3 would, among other things, direct CC-1 to open bank accounts, alert CC-1 as to when CC-1 would receive money, and direct CC-1 to where to send money that CC-1 received.

iv.    CC-1 further stated that either UKO or CC-3 had directed him to send and receive the money with respect to BEC-1, as described in the February 11 Complaint, but that he did not recall, as to that scheme, whether it was UKO or CC-3.

d.    CC-1 consented to a search of his cell phone, <u>i.e.</u> the CC-1 Phone.  CC-1 unlocked the CC-1 Phone and allowed law enforcement officers to inspect its contents.

e.    The CC-1 Phone contained WhatsApp text communications and records of WhatsApp phone calls between CC-1 and a WhatsApp user identified as "Princejoseph," who communicated with CC-1 using a certain phone number (the "UKO Number").  CC-1 stated that he knew the WhatsApp user "Princejoseph" by the name "Prince."  The text communications

between "Princejoseph" and CC-1 included, among others, the following:

        i.    On or about September 11 and 13, 2019, the following exchange occurred:

| | |
|---|---|
| CC-1: | [Bank Account-1 information] |
| Princejoseph: | Prince K. Uko |
| | Account#[Omitted] |
| | Routine# [Omitted] |
| | [texts omitted] |
| CC-1: | [Bank Account-1 information] |
| | I THINK, U SHOULD USE THIS ACCOUNT 4 the 800K!!! |
| Princejoseph: | Ok cool |

        ii.    As described above and in the February 11 Complaint, Bank Account-1 is the bank account that CC-1 used to receive $250,000 of proceeds from BEC-1 and from which CC-1 wired $237,500 to a bank account held at a bank in China.

        iii.    On or about October 15 and 16, 2019, the following exchange occurred:

| | |
|---|---|
| Princejoseph: | How far |
| | Did you take out the money yet ?? |
| | Call me |
| | I'm waiting for you |

        iv.    On or about November 22, 2019, following, the following text exchange occurred:

| | |
|---|---|
| | [Two missed calls] |
| Princejoseph: | Sup |
| | [One missed call] |

| CC-1: | I GOT THE CHECK!!! I WILL DEPOSIT N THE MORNING!!! |
| | |
| | [One missed call] |
| Princejoseph: | Yay!! |
| | Call me |
| | [Two missed calls] |

  f. The CC-1 Phone also contained WhatsApp text communications and records of WhatsApp phone calls between CC-1 and another WhatsApp user (the "CC-3 Alias"), who communicated with CC-1 using a certain phone number (the "CC-3 Number").  CC-1 stated that the CC-3 Alias was used by CC-3.  On or about November 29, 2019, the CC-3 Alias texted CC-1 the account information for the "U.K. Account," the same bank account that received $1,000,000 of the proceeds of BEC-1, as described in the February 11 Complaint.  (Ex. A ¶ 13(b).)  The CC-3 Alias then texted to CC-1: "Send this amount here 109,717.2."

  g. Based on phone records obtained in the course of this investigation, during the period from April 9, 2019 to September 6, 2019, there were approximately 184 contacts between the UKO Number and the CC-3 Number.

<u>Search of the UKO PHONE and PRINCE UKO's Interview Statements</u>

  17. Based on my discussions with other law enforcement officers and my review of reports prepared by other law enforcement officers, I have learned, among other things, the following:

  a. On or about February 28, 2020, the Honorable Christopher C. Bly, United States Magistrate Judge, Northern District of Georgia, authorized a search and seizure warrant(the "UKO Phone Warrant") for the cell phone assigned the UKO Number (the "UKO Phone").

  b. On or about February 28, 2020, law enforcement executed the UKO Phone Warrant and found the UKO Phone in the possession of PRINCE UKO, the defendant.  UKO confirmed that the UKO Phone belonged to him.

  c. Upon conducting an initial review of the contents of the UKO Phone pursuant to the UKO Phone Warrant, law enforcement officers discovered that a substantial amount of

data on the UKO Phone was missing, including the communications between the WhatsApp communications between UKO and CC-1.  Based on my training and experience, I believe that data on the UKO Phone had been deleted.

        d.   On or about February 28, 2020, UKO consented to a voluntary interview with law enforcement officers, which lasted until approximately 12:30 a.m. on February 29, 2020. Among the law enforcement officers who conducted the interview were a Special Agent of the New York Field Office of the Federal Bureau of Investigation (the "FBI Agent") and an investigator with the United States Attorney's Office for the Southern District of New York (the "SDNY Investigator").

        i.   At the outset of the interview, and repeatedly during the interview, UKO was advised that lying to federal agents was a crime.

        ii.   At the outset of the interview, the FBI Agent and the SDNY Investigator identified the law enforcement agencies for which they worked and advised UKO that the interview concerned an investigation by those agencies.  UKO was also advised that the FBI Agent and SDNY Investigator had flown to Georgia from New York in connection with the investigation.

        iii.   During the interview, UKO confirmed that he knew CC-3 and he described CC-3 as his "roommate" and "cousin."

        iv.   When law enforcement officers asked UKO whether he had exchanged text communications with CC-1 on WhatsApp involving the transfer of money, UKO falsely stated, in sum and substance, that he never exchanged text communications with CC-1 regarding the receipt or sending of money from bank accounts.

        v.   During the interview, UKO confirmed that he controlled certain bank accounts, including the bank account in the name of the UKO Entity.  UKO further confirmed that he controlled the UKO Entity.  In response to questions regarding transactions in UKO Entity Account involving the proceeds of the IGO Scheme, UKO falsely stated, in sum and substance, that the transactions were legitimate business transactions for his textile business.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of PRINCE UKO, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

_____
TABATHA IALACCI
Special Agent
United States Secret Service

Sworn to before me this
29 day of February, 2020

_____
THE SARAH L. CAVE
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

**EXHIBIT A**

Approved: _____
JUN XIANG / KEVIN MEAD
Assistant United States Attorneys

Before:    THE HONORABLE ROBERT W. LEHRBURGER
           United States Magistrate Judge
           Southern District of New York

- - - - - - - - - - - - - - - -  X
                                 :
UNITED STATES OF AMERICA         :      SEALED COMPLAINT
                                 :
     - v. -                      :      Violations of
                                 :      18 U.S.C. §§ 1028A,
JACOB SAGIAO,                    :      1343, 1349, 1956(h), and
MARYLYNN PENEUETA,               :      2
BRITT JACKSON,                   :
JOSHUA FITTEN,                   :      COUNTY OF OFFENSE:
DONTAE COTTRELL,                 :      NEW YORK
ARINZE OBIKA,                    :
NDUKWE ANYAOGU,                  :      20 MAG 1546
HERMAN BASS,                     :
DAVID URO, and                   :
VICTOR AHAIWE,                   :
                                 :
                 Defendants.     :
                                 :
- - - - - - - - - - - - - - - -  X


SOUTHERN DISTRICT OF NEW YORK, ss.:

          JARED EANNUCCI, being duly sworn, deposes and says
that he is a Task Force Officer with the United States
Attorney's Office for the Southern District of New York and an
Officer with U.S. Customs and Border Protection, and charges as
follows:

COUNT ONE
(Conspiracy to Commit Bank Fraud)
(Business Email Compromise)

          1.    From at least in or about March 2019 up to and
including at least in or about May 2019, in the Southern
District of New York and elsewhere, JACOB SAGIAO, MARYLYNN
PENEUETA, BRITT JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE
OBIKA, NDUKWE ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR

1

AHAIWE, the defendants, and others known and unknown, willfully
and knowingly, did combine, conspire, confederate, and agree
together and with each other to commit bank fraud, in violation
of Title 18, United States Code, Section 1344.

          2.   It was a part and an object of the conspiracy
that JACOB SAGIAO, MARYLYNN PENEUETA, BRITT JACKSON, JOSHUA
FITTEN, DONTAE COTTRELL, ARINZE OBIKA, NDUKWE ANYAOGU, HERMAN
BASS, DAVID URO, and VICTOR AHAIWE, the defendants, and others
known and unknown, willfully and knowingly, would and did
execute and attempt to execute a scheme and artifice to defraud
a financial institution, the deposits of which were then insured
by the Federal Deposit Insurance Corporation, and to obtain
moneys, funds, credits, assets, securities, and other property
owned by, and under the custody and control of, such financial
institution, by means of false and fraudulent pretenses,
representations, and promises, in violation of Title 18, United
States Code, Section 1344.

          (Title 18, United States Code, Section 1349.)

                         COUNT TWO
              (Conspiracy to Commit Money Laundering)
                  (Business Email Compromise)

          3.   From at least in or about March 2019 up to and
including at least in or about May 2019, in the Southern
District of New York and elsewhere, JACOB SAGIAO, MARYLYNN
PENEUETA, BRITT JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE
OBIKA, NDUKWE ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR
AHAIWE, the defendants, and others known and unknown,
intentionally and knowingly did combine, conspire, confederate,
and agree together and with each other to commit money
laundering, in violation of Title 18, United States Code,
Section 1956(a)(1)(B)(i).

          4.   It was a part and an object of the conspiracy
that JACOB SAGIAO, MARYLYNN PENEUETA, BRITT JACKSON, JOSHUA
FITTEN, DONTAE COTTRELL, ARINZE OBIKA, NDUKWE ANYAOGU, HERMAN
BASS, DAVID URO, and VICTOR AHAIWE, the defendants, and others
known and unknown, knowing that the property involved in certain
financial transactions represented the proceeds of some form of
unlawful activity, would and did conduct and attempt to conduct
such financial transactions which in fact involved the proceeds
of specified unlawful activity, to wit, wire fraud schemes
involving business email compromises, knowing that the
transactions were designed in whole and in part to conceal or

                              2

disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

COUNT THREE
(Aggravated Identity Theft)

5.    From at least in or about February 2019 up to and including at least in or about May 2019, in the Southern District of New York and elsewhere, VICTOR AHAIWE, the defendant, knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, AHAIWE controlled and transacted in a bank account of another person, who was deceased, including by using a debit card for that bank account, while holding himself out to be that other person, during and in relation to the bank fraud conspiracy alleged in Count One of this Complaint.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

COUNT FOUR
(Wire Fraud)
(Romance Fraud)

6.    From at least in or about June 2019 up to and including the present, in the Southern District of New York and elsewhere, BRITT JACKSON, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, JACKSON participated in and received proceeds from an online romance fraud, in which the victim was induced to send money to JACKSON based on false representations, and, in furtherance of such scheme, JACKSON caused an interstate wire to be sent from

Pennsylvania to Georgia, which wire was processed through a bank located in New York, New York.

(Title 18, United States Code, Sections 1343 and 2.)

COUNT FIVE
(Wire Fraud)
(Fiji Fraud)

7.     From at least in or about October 2018 up to and including at least in or about October 2018, in the Southern District of New York and elsewhere, NDUKWE ANYAOGU, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, ANYAOGU participated in and received the proceeds from an email compromise scheme in which a law firm in Fiji was induced to send money to ANYAOGU based on false representations, and, in furtherance of such scheme, ANYAOGU caused an international wire to be sent from Fiji to Georgia, which wire was processed through a correspondent bank located in New York, New York.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

8.·    I am a Task Force Officer with the United States Attorney's Office for the Southern District of New York and an Officer with U.S. Customs and Border Protection.  I have been personally involved in the investigation of this matter.  This affidavit is based upon my investigation, my conversations with law enforcement agents and others, and my examination of reports and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4

Overview

9.     From at least in or about March 2019 up to and including at least in or about May 2019, JACOB SAGIAO, MARYLYNN PENEUETA, BRITT JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE OBIKA, NDUKWE ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR AHAIWE, the defendants, received, transferred, and sent the proceeds of two business email compromise schemes (the "BEC Schemes"), described further below, in which the victims (the "Victims") were induced to send approximately $4.5 million to bank accounts controlled by SAGIAO and OBIKA.  In order to launder the proceeds of the BEC Schemes, the defendants created bank accounts that listed "d/b/a" names that closely resembled the names of real companies, so that transfers of proceeds between and among those bank accounts would appear to be transactions between real companies.

a.     In the first BEC Scheme ("BEC-1"), a technology company ("Victim-1") was induced to send approximately $4 million to a bank account, which listed, as a "d/b/a" of the accountholder, the name of an actual business counterparty of Victim-1 ("Counterparty-1"), but which was actually controlled by SAGIAO.  After SAGIAO received the proceeds of BEC-1, SAGIAO transferred those proceeds, either directly or through intermediaries, to bank accounts controlled by PENEUETA, JACKSON, FITTEN, and COTTRELL, each of which listed, as a "d/b/a" of the accountholder, a name that closely resembled the name of a real company that the accountholder was not affiliated with.

b.     In the second BEC Scheme ("BEC-2"), a health services organization ("Victim-2") was induced to send approximately $500,000 to a bank account, which listed, as a "d/b/a" of the accountholder, a name that closely resembled the name of a food company ("Counterparty-2"), but which was actually controlled by OBIKA.  After OBIKA received the proceeds of BEC-2, OBIKA transferred those proceeds, either directly or through intermediaries, to bank accounts controlled by SAGIAO, FITTEN, URO, ANYAOGU, and BASS, each of which listed, as a "d/b/a" of the accountholder, a name that closely resembled the name of a real company that the accountholder was not affiliated with.  Proceeds of BEC-2 were also sent to AHAIWE, who deposited the funds in a bank account in the name of a deceased person (the "Decedent") that AHAIWE controlled.

10.    From at least in or about June 2019 up to and including the present, BRITT JACKSON, the defendant,

participated in and received proceeds from an online romance
fraud scheme, in which a man residing in Pennsylvania ("Victim-
3") was induced to send over $130,000 based on false
representations (the "Romance Fraud").

11.   From at least in or about October 2018 up to and
including at least in or about October 2018, NDUKWE ANYAOGU, the
defendant, participated in and received approximately $380,000
in proceeds from an email compromise scheme involving a law firm
in Fiji, which were intended for a woman residing in California
("Victim-4") (the "Fiji Fraud").

                              BEC-1

12.   Based on my review of reports prepared by other
law enforcement officers, including documents referenced in
those reports and documents provided to me by Victim-1,[1] I have
learned, among other things, the following:

          a.   Victim-1 is a Chinese technology company.
Victim-1 regularly conducts business with Counterparty-1, which
is a corporate affiliate of a major U.S. technology company.

          b.   On or about March 27, 2019, an employee of
Victim-1 ("Employee-1") received an email purporting to be from
an employee in the procurement department of Victim-1's parent
company ("Employee-2").   This email--which was sent from the
same email address that Employee-2 had previously used to
correspond with Employee-1 about business--falsely stated that
the payee information for Counterparty-1 had changed and that
the new bank account for Counterparty-1 was a certain bank
account purportedly held at a bank in New York, New York ("Phony
Counterparty-1 Account").[2]   In fact, Employee-2 did not send this
email and was not aware of the email at the time it was sent.[3]

---

[1]   Certain documents I have reviewed in the course of this
investigation were originally written in Chinese.   I have
reviewed and relied upon English translations of those documents
provided by Victim-1.

[2]   Based on my review of bank records, I have learned that, in
reality, Phony Counterparty-1 Account is held at a bank in
California.

[3]   Based on my training and experience, I believe that
Employee-2's email account was hacked and that an attacker sent

      c.    On or about April 1, 2019, Employee-2 sent an email to Employee-1 directing Employee-1 to make a payment of $4,088,412 to Counterparty-1 in connection with a business transaction.  This was a legitimate email from Employee-2.

      d.    On or about April 2, 2019, Employee-1 wired $4,088,412 to Phony Counterparty-1 Account, in reliance on the March 27, 2019 email.

      e.    On or about April 16, 2019, Counterparty-1 advised Victim-1 that Phony Counterparty-1 Account did not belong to Counterparty-1 or any of its corporate affiliates.

    13.    Based on bank records and other documents and evidence that I have reviewed in the course of this investigation, including bank surveillance and certain open source materials, I have learned, among other things, the following:

      a.    Phony Counterparty-1 Account was opened in person by JACOB SAGIAO, the defendant, on or about March 19, 2019, and lists, as a "d/b/a" of SAGIAO (the accountholder), a name that closely resembles the name of Counterparty-1, although, as discussed above, Phony Counterparty-1 Account did not belong to Counterparty-1 or any of its corporate affiliates.

      b.    On or about April 5, 2019, after receiving the $4,088,412 wire transfer from Victim-1, SAGIAO sent a wire transfer in the amount of $1,000,000 from Phony Counterparty-1 Account to a bank account held at a bank in the United Kingdom (the "U.K. Account").  This wire transfer was processed through a correspondent bank located in New York, New York.

      c.    On or about April 5, 2019, SAGIAO withdrew cashier's checks in the amounts of $250,000 and $290,000 from Phony Counterparty-1 Account.  Bank surveillance shows that SAGIAO was the person who withdrew the cashier's checks.[4]

---

the March 27, 2019 email to Employee-1 purporting to be from Employee-2.

[4]    In the course of this investigation, I have obtained a photograph of SAGIAO from records maintained by the California Department of Motor Vehicles.  Based on comparison with this

         d.    On or about April 8, 2019, the $250,000
cashier's check that SAGIAO withdrew from Phony Counterparty-1
Account was deposited into a certain bank account ("Bank
Account-1").  Bank Account-1 was opened in person by BRITT
JACKSON, the defendant, on or about October 23, 2018, and lists,
as a "d/b/a" of JACKSON (the accountholder), a name that closely
resembles the name of a real company ("Company-1").  The
cashier's check deposited into Bank Account-1 was made payable
to Company-1 and bank surveillance shows that JACKSON was the
person who deposited the check.[5]

              i.    Company-1 is a Canadian company in the
business of manufacturing tractors.  The transaction history in
Bank Account-1 reflects no transactions that appear to relate to
the legitimate business of Company-1.  After Bank Account-1 was
opened on or about October 23, 2018, no transactions occurred
until the deposit of $250,000 on or about April 8, 2019.

              ii.    JACKSON, who lives in Georgia, has no
known connection to Company-1.  The corporate address listed for
Company-1 in account opening documents for Bank Account-1 is
JACKSON's own personal address, as reflected on his driver's
license.  When JACKSON opened Bank Account-1, he described
Company-1 as a sole proprietorship of which he was the owner,
whereas the real Company-1 is a corporation.

              iii.    On or about May 2, 2019, after the
$250,000 cashier's check was deposited into Bank Account-1,
JACKSON sent a wire, in the amount of $237,500, from Bank
Account-1 to a bank account held at a bank in China.

         e.    On or about April 8, 2019, the $290,000
cashier's check that SAGIAO withdrew from Phony Counterparty-1
Account was deposited into a certain bank account ("Bank
Account-2").  Bank Account-2 was opened in person by MARYLYNN
PENEUETA, the defendant, on or about March 15, 2019, and lists,

---

photograph, I believe that the person in the bank surveillance
is SAGIAO.

[5]    In the course of this investigation, I have obtained a
photograph of JACKSON from records maintained by the Georgia
Department of Motor Vehicles.  Based on comparison with this
photograph, I believe that the person in the bank surveillance
is JACKSON.

as a "d/b/a" of PENEUETA (the accountholder), a name that closely resembles the name of a real company ("Company-2"). The cashier's check deposited into Bank Account-2 was made payable to Company-2.

        i.     Based on public social media posts and open source information, I have learned that PENEUETA is the wife or romantic partner of SAGIAO and that they reside together.

        ii.    Company-2 is a New York company in the business of manufacturing concrete products. The transaction history in Bank Account-2 reflects no transactions that appear to relate to the legitimate business of Company-2.

        iii.   PENEUETA, who lives in California, has no known connection to Company-2. The corporate address listed for Company-2 in the account opening documents for Bank Account-2 is PENEUETA's own personal address, as reflected on her driver's license. When PENEUETA opened Bank Account-2, she described Company-2 as a sole proprietorship of which she was the owner, whereas the real Company-2 is a corporation.

        iv.    After the $290,000 cashier's check was deposited into Bank Account-2, on or about April 22, 2019, PENEUETA sent a wire, in the amount of $88,950, from Bank Account-2 to a bank account held at a bank in Canada. On or about April 23, 2019, PENEUETA sent another wire, in the amount of $88,950, from Bank Account-2 to a bank account held at a bank in China. Each of these wire transfers was processed through a correspondent bank located in New York, New York.

        f.   On or about April 22, 2019, after receiving the $290,000 cashier's check from SAGIAO, PENEUETA purchased the following five cashier's checks using funds from Bank Account-2:

        i.     A cashier's check in the amount of $16,000 ("PENEUETA Check-1");

        ii.    A cashier's check in the amount of $16,000 ("PENEUETA Check-2");

        iii.   A cashier's check in the amount of $15,615 ("PENEUETA Check-3");

        iv.    A cashier's check in the amount of $16,645 ("PENEUETA Check-4"); and

v.    A cashier's check in the amount of $20,000 ("PENEUETA Check-5").

g.    On or about April 23, 2019, PENEUETA Check-1 and PENEUETA Check-2, totaling $32,000, were deposited into a certain bank account ("Bank Account-3").  Bank Account-3 was opened in person by DONTAE COTTRELL, the defendant, on or about April 12, 2019, and lists, as a "d/b/a" of COTTRELL (the accountholder), a name that closely resembles the name of a real company ("Company-3").  Both PENEUETA Check-1 and PENEUETA Check-2 were made payable to Company-3.  Account opening documents show that COTTRELL's driver's license, bearing his photograph, was provided to the bank at the time of account opening.[6]

i.    Company-3 is a major California company in the business of manufacturing power tools.  The transaction history in Bank Account-3 reflects no transactions that appear to relate to the legitimate business of Company-3.

ii.    COTTRELL, who lives in California, has no known connection to Company-3.  The corporate address listed for Company-3 in the account opening documents for Bank Account-3 is COTTRELL's own personal address, as reflected on his driver's license.  When COTTRELL opened Bank Account-3, he described Company-3 as a sole proprietorship of which he was the owner.

iii.    Between in or about April 23, 2019 and April 26, 2019, COTTRELL made cash withdrawals in the total amount of $32,000 from Bank Account-3.

h.    On or about April 26, 2019 and April 29, 2019, PENEUETA Check-3 and PENEUETA Check-4, respectively, totaling $32,260, were deposited into a certain bank account ("Bank Account-4").  Bank Account-4 was opened in person by JOSHUA FITTEN, the defendant, on or about March 21, 2019, and

---

[6]    Bank records for Bank Account-3 list the driver's license number that was provided to the bank at the time of account opening.  In the course of this investigation, I have obtained a photograph of COTTRELL, maintained by the California Department of Motor Vehicles, linked to the same driver's license number. The photograph on the driver's license matches a photograph that COTTRELL submitted as part of a passport application in 2012.

lists, as a "d/b/a" of FITTEN (the accountholder), a name that
closely resembles the name of a real company ("Company-4").
Both PENEUETA Check-3 and PENEUETA Check-4 were made payable to
Company-4.  Account opening documents show that FITTEN's
driver's license, bearing his photograph, was provided to the
bank at the time of account opening.[7]

        i.  Company-4 is a Taiwanese company in the
business of manufacturing hand tools and industrial hardware.
The transaction history in Bank Account-4 reflects no
transactions that appear to relate to the legitimate business of
Company-4.

        ii.  FITTEN, who lives in California, has no
known connection to Company-4.  The corporate address listed for
Company-4 in account opening documents for Bank Account-4 is
FITTEN's own personal address, as reflected on his credit
reports.  When FITTEN opened Bank Account-4, he described
Company-4 as a sole proprietorship of which he was the owner,
whereas the real Company-4 is a corporation.

        iii.  Between April 26, 2019 and April 30,
2019, FITTEN made cash withdrawals in the total amount of
$32,800 from Bank Account-4.

        i.  On or about April 22, 2019, PENEUETA Check-
5, in the amount of $20,000, was deposited into a certain bank
account ("Bank Account-5").  Bank Account-5 was opened in person
by JACOB SAGIAO, the defendant, on or about January 31, 2019,
and lists, as a "d/b/a" of SAGIAO (the accountholder), a name
that closely resembles the name of a real company ("Company-5").
PENEUETA Check-5 was made payable to Company-5.

---

[7]  Bank records for Bank Account-4 list the driver's license
number that was provided to the bank at the time of account
opening.  As described further below in paragraph 16(f), the
same driver's license number was provided when FITTEN opened
another account, Bank Account-8 (as defined below).  Bank
records for Bank Account-8 include a photocopy of that driver's
license, which includes a photograph of FITTEN.  Furthermore,
FITTEN provided the same phone number for both Bank Account-4
and Bank Account-8.  Based on telephone subscriber records I
have reviewed in the course of this investigation, the
subscriber of that phone number is FITTEN.

        i.     Company-5 is a Serbian company in the military defense business.  The transaction history in Bank Account-5 reflects no transactions that appear to relate to the legitimate business of Company-5.

        ii.    SAGIAO, who lives in California, has no known connection to Company-5.  The corporate address listed for Company-5 in account opening documents for Bank Account-5 is SAGIAO's own personal address, as reflected on his driver's license.  When SAGIAO opened Bank Account-5, he described Company-5 as a sole proprietorship of which he was the owner, whereas the real Company-5 is a corporation.

        iii.   On or about May 1, 2019, SAGIAO made a cash withdrawal in the amount of $14,000 from Bank Account-5.

<u>BEC-2</u>

14.  Based on my discussions with other law enforcement officers and my review of reports prepared by other law enforcement officers, I have learned, among other things, the following:

        a.    Victim-2 is a health services organization in Sint Maarten.

        b.    On or about March 4, 2019, Victim-2's finance department received an email from the email account of the Chief Financial Officer of Victim-2 (the "CFO") directing a $500,000 wire transfer to a certain bank account in Brooklyn, New York ("Phony Counterparty-2 Account") for the benefit of Counterparty-2, which is a real company.  In fact, the CFO did not send this email and was not aware of this email at the time it was sent.

        c.    On or about March 6, 2019, Victim-2's finance department wired $499,900 ($500,000 minus a $100 wire fee) to Phony Counterparty-2 Account, in reliance on the March 4, 2019 email.  This wire transfer was processed through a correspondent bank located in New York, New York.

        d.    On or about March 11, 2019, the CFO was alerted to the wire transfer and learned that his email account had been compromised.

15.  Based on my discussion with a representative of Counterpary-2, I have learned, among other things, that Phony

Counterparty-2 Account did not belong to Counterparty-2 or any of its corporate affiliates.

16.   Based on bank records and other documents and evidence that I have reviewed in the course of this investigation, including bank surveillance and certain open source materials, I have learned, among other things, the following:

a.   Phony Counterparty-2 Account was opened in person by ARINZE OBIKA, the defendant, on or about November 16, 2018, and lists, as a "d/b/a" of OBIKA (the accountholder), a name that closely resembles the name of Counterparty-2, although, as discussed above, Phony Counterparty-2 Account did not belong to Counterparty-2 or any of its corporate affiliates. Account opening documents show that OBIKA's driver's license, bearing his photograph, was provided to the bank at the time of account opening.[8]

b.   On or about March 8, 2019, after receiving the $499,900 wire transfer from Victim-2, OBIKA withdrew $485,974 from Phony Counterparty-2 Account and purchased the following five cashier's checks:

i.   A cashier's check in the amount of $50,988 ("OBIKA Check-1");

ii.   A cashier's check in the amount of $34,993 ("OBIKA Check-2");

iii.   A cashier's check in the amount of $34,993 ("OBIKA Check-3");

iv.   A cashier's check in the amount of $196,000 ("OBIKA Check-4"); and

v.   A cashier's check in the amount of $169,000 ("OBIKA Check-5").

c.   Between on or about March 8, 2019 and March 11, 2019, OBIKA made cash withdrawals in the total amount of $13,800 from Phony Counterparty-2 Account.

---

[8]   A photocopy of OBIKA's driver's license was maintained in the bank records for Phony Counterparty-2 Account.

            d.    On or about March 8, 2019, OBIKA Check-1, in
the amount of $50,988, was deposited into a certain bank account
("Bank Account-6").  Bank Account-6 was opened in person by
DAVID URO, the defendant, on or about December 11, 2018, and
lists, as a "d/b/a" of URO (the accountholder), a name that
closely resembles the name of a real company ("Company-6").
OBIKA Check-1 was made payable to Company-6.  Account opening
documents show that URO's Nigerian passport and United States
Permanent Resident card, both bearing his photograph, were
provided to the bank at the time of account opening.[9]

            i.    Company-6 is a British company in the
commercial aerospace, defense, and security businesses.  The
transaction history in Bank Account-6 reflects no transactions
that appear to relate to the legitimate business of Company-6.

            ii.    URO, who lives in New York, has no
known connection to Company-6.  The corporate address listed for
Company-6 in account opening documents for Bank Account-6 is
URO's own personal address, as reflected on his driver's
license.  This same address was listed by ARINZE OBIKA, the
defendant, as the address for the accountholder of Phony
Counterparty-2 Account.  When URO opened Bank Account-6, he
described Company-6 as a sole proprietorship of which he was the
owner, whereas the real Company-6 is a corporation.

            iii.    Between in or about March 12, 2019 and
March 13, 2019, URO made cash withdrawals in the total amount of
$24,000 from Bank Account-8.

            e.    On or about March 11, 2019, OBIKA Check-2,
in the amount of $34,993, was deposited into a certain bank
account ("Bank Account-7").  Bank Account-7 was opened in person
by JACOB SAGIAO, the defendant, on or about February 28, 2019,
and lists, as a "d/b/a" of SAGIAO (the accountholder), a name
that closely resembles the name of a real company ("Company-7").
OBIKA Check-2 was made payable to Company-7.  Account opening
documents show that SAGIAO's driver's license, bearing his

---

[9]    Photocopies of the Nigerian passport and Permanent Resident
card were maintained in the bank records for Bank Account-6.

photograph, and his Social Security Card were provided to the
bank at the time of account opening.[10]

      i.    Company-7 is a Dutch company that
appears to be in the zoo logistics business.  The transaction
history in Bank Account-7 reflects no transactions that appear
to relate to the legitimate business of Company-7.

      ii.    SAGIAO, who lives in California, has no
known connection to Company-7.  The corporate address listed for
Company-7 in the account opening documents for Bank Account-7 is
SAGIAO's own personal address, as reflected on his driver's
license.  When SAGIAO opened Bank Account-7, he described
Company-7 as a sole proprietorship of which he was the owner,
whereas the real Company-7 is a corporation.

      iii.    On or about March 12, 2019, SAGIAO made
cash withdrawals in the total amount of $34,000 from Bank
Account-7.

      f.    On or about March 11, 2019, OBIKA Check-3,
in the amount of $34,993, was deposited into a certain bank
account ("Bank Account-8").  Bank Account-8 was opened in person
by JOSHUA FITTEN, the defendant, on or about January 9, 2019,
and lists, as a "d/b/a" of FITTEN (the accountholder), a name
that closely resembles the name of a real company ("Company-8").
OBIKA Check-3 was made payable to Company-8.  Account opening
documents show that FITTEN's driver's license, bearing his
photograph, and his Social Security Card were provided to the
bank at the time of account opening.[11]

      i.    According to records maintained by the
British government, Company-8 is a British company that was
dissolved in or about October 2016 and then re-formed in or
about March 12, 2019.  The transaction history in Bank Account-8
reflects no transactions that appear to relate to the legitimate
business of Company-8.

---

[10]    Photocopies of SAGIAO's driver's license and Social
Security Card were maintained in the bank records for Bank
Account-7.

[11]    Photocopies of FITTEN's driver's license and Social
Security Card were maintained in the bank records for Bank
Account-8.

        ii.     FITTEN, who lives in California, has no known connection to Company-8.  The corporate address listed for Company-8 in the account opening documents for Bank Account-8 is FITTEN's own personal address, as reflected on his credit reports.

        iii.    On or about March 11, 2019, the same day that OBIKA Check-3, in the amount of $34,993, was deposited into Bank Account-8, FITTEN made a cash withdrawal in the amount of $34,400 from Bank Account-8.

        g.    On or about March 11, 2019, OBIKA Check-4, in the amount of $196,000 was deposited into a certain bank account ("Bank Account-9").  Bank Account-9 was opened in person by NDUKWE ANYAOGU, the defendant, on or about December 27, 2019, and lists, as a "d/b/a" of ANYAOGU (the accountholder), the name of a shell company ("Company-9").  OBIKA Check-4 was made payable to Company-9.  Account opening documents show that ANYAOGU's driver's license, bearing his photograph, was provided to the bank at the time of account opening.[12]

        i.     Company-9 was organized by ANYAOGU as a Georgia LLC in or about August 22, 2018.  Based on my review of open source material and public databases, Company-9 conducts no real business.  The corporate address listed for Company-9 in account opening documents for Bank Account-9 for Company-9 is ANYAOGU's own personal address, as reflected on his driver's license.  The building at that address is a residential apartment building.

        ii.    On or about March 20, 2019, ANYAOGU attempted to wire $191,500 from Bank Account-9 to the U.K. Account, which is the same account to which JACOB SAGIAO, the defendant, wired $1,000,000 of the proceeds of BEC-1, as described above in paragraph 13(b).  The requested wire transfer was declined by the bank where Bank Account-9 was held.  On or about March 21, 2019, ANYAOGU withdrew the balance of Bank Account-9, in the amount of $193,539.85, as a cashier's check made out to Company-9.

        h.    On or about March 14, 2019, OBIKA Check-5, in the amount of $169,000, was deposited into a certain bank account ("Bank Account-10").  Bank Account-10 was opened in

---

[12]    A photocopy of ANYAOGU's driver's license was maintained in the bank records for Bank Account-9.

person by HERMAN BASS, the defendant, on or about March 14, 2019, and lists, as a "d/b/a" of BASS (the accountholder), a name that closely resembles the name of a real company ("Company-10"). OBIKA Check-5 was made payable to Company-10.

      i.    Company-10 is a California company in the business of valve engineering and manufacturing. The transaction history in Bank Account-10 reflects no transactions that appear to relate to the legitimate business of Company-10.

      ii.    BASS, who lives in California, has no known connection to Company-10. The corporate address for Company-10 listed in the account opening documents for Bank Account-10 is not the address listed on the real Company-10's website as Company-10's corporate address. When BASS opened Bank Account-10, he described Company-10 as a sole proprietorship of which he was the owner.

      iii.    On or about March 23, 2019 and March 25, 2019, BASS wrote two personal checks from Bank Account-10 made payable to the Decedent, a person who, according to public records, died on or about January 3, 2019 (the "Decedent Checks"). Bank surveillance shows BASS accessing Bank Account-10 at a teller window on or about March 26, 2019.[13]

      i.    On or about March 25 and 26, 2019, the Decedent Checks, totaling $100,000, were deposited into a certain bank account in the name of the Decedent ("Bank Account-11"). On or about April 5, 2019, a check in the amount of $27,250 drawn on Bank Account-11 was deposited at another bank account in the name of the Decedent ("Bank Account-12"). For the following reasons, I believe that, at the time the $27,250 check was deposited, Bank Account-12 was under the control of VICTOR AHAIWE, the defendant:

      i.    AHAIWE also maintained an account in his own name (the "AHAIWE Account") at the same bank where Bank Account-12 is held.

---

[13]    In the course of this investigation, I have obtained a photograph of BASS from records maintained by the California Department of Motor Vehicles. Based on comparison with this photograph, I believe that the person in the bank surveillance is BASS.

ii.    The address listed for the Decedent in Bank Account-12 is the same as the address listed for AHAIWE in the AHAIWE Account.  Based on my review of phone subscriber records, I have learned that the phone number listed for the Decedent on Bank Account-12 is subscribed to AHAIWE's home address.  Based on my review of email subscriber records, I have learned that the subscriber of the email account listed for the Decedent on Bank Account-12 is AHAIWE.

iii.    Bank surveillance shows that, on or about March 6, 2019, AHAIWE accessed Bank Account-12 from an ATM.[14]  Bank records show that AHAIWE used the debit card for Bank Account-12, in the name of the Decedent, in order to access the ATM.

### Online Romance Fraud

17.    Based on my discussions with Victim-3 and documents provided to me by Victim-3, along with certain open source materials, I have learned, among other things, the following:

a.    Victim-3 resides in Pennsylvania.

b.    In or about June 2019, Victim-3 met an individual who identified himself as "Joseph Cordoba" on an online dating website.  After initially meeting on the website, Victim-3 and "Joseph Cordoba" continued their communications through email and by phone.

c.    In the course of communications with Victim-3, "Joseph Cordoba" stated, in sum and substance, that he owned an interior design business (the "Phony Design Business") in Connecticut.  Based on my review of open source and law enforcement databases, the Phony Design Business does not exist.

d.    In the course of email communications with Victim-3, "Joseph Cordoba" purported to live at an address in Connecticut.  Based on my review of open source material, that address does not exist.

---

[14]    In the course of this investigation, I have obtained a photograph of AHAIWE from records maintained by the California Department of Motor Vehicles.  Based on comparison with this photograph, I believe that the person in the bank surveillance is AHAIWE.

e.   In or about July 2019, "Joseph Cordoba" called Victim-3 and stated, in sum and substance, that he needed to pay import taxes on furniture for the Phony Design Business to an importer (the "Phony Importer").  In reliance on this representation and subsequent phone and email communications with "Joseph Cordoba," on or about July 11, 2019, Victim-3 mailed a $10,000 check payable to the Phony Importer, addressed to BRITT JACKSON, the defendant.  "Joseph Cordoba" had previously described JACKSON as a representative of the Phony Importer.

f.   In or about July 2019, "Joseph Cordoba," in phone and email communications, told Victim-3, in sum and substance, that he needed money to pay for the shipping of furniture from the Phony Importer to the Phony Design Business. "Joseph Cordoba" agreed to treat as a loan any money that Victim-3 sent for this purpose, and "Joseph Cordoba" executed a promissory note.  In reliance on these representations, Victim-3 initiated the following wires:

i.   On or about July 16, 2019, Victim-3 wired $16,500 to JACKSON at a bank account in Georgia provided by "Joseph Cordoba" ("Bank Account-13").  This wire was processed through a bank located in New York, New York.

ii.   On or about July 24, 2019, Victim-3 wired an additional $30,000 to JACKSON at Bank Account-13.  This wire was processed through a bank located in New York, New York.

g.   In or about August 2019, "Joseph Cordoba," in phone and email communications, told Victim-3, in sum and substance, that he needed money to pay for fees related to the estate of the father of "Joseph Cordoba," which "Joseph Cordoba" claimed was worth millions of U.S. dollars.  "Joseph Cordoba" agreed to treat as a loan any money that Victim-3 sent for this purpose, and "Joseph Cordoba" executed a promissory note.  In reliance on these communications, on or about August 21, 2019, Victim-3 wired $80,000 to a bank account in Hong Kong, China.

h.   In or about the summer of 2019, "Joseph Cordoba" and Victim-3 made plans to meet for a date in Manhattan.  In anticipation of that meeting, Victim-3 made travel arrangements, including a hotel reservation.  Shortly before the planned meeting, "Joseph Cordoba" cancelled.  Victim-3 has never seen "Joseph Cordoba" in person.

i.   "Joseph Cordoba" has not repaid any of the promissory notes that he executed in order to induce Victim-3 to send money.

j.   "Joseph Cordoba" continues to communicate with Victim-3 through the present.

18.   Based on bank records and other documents and evidence that I have reviewed in the course of this investigation, including bank surveillance, I have learned, among other things, the following:

a.   Bank Account-13 was opened in person in or about November 19, 2018 by BRITT JACKSON, the defendant.

b.   On or about July 16, 2019, the same day that Victim-3 wired $16,500 to Bank Account-13, JACKSON withdrew cash from Bank Account-13 at an ATM.   Bank surveillance shows that JACKSON was the person who accessed the ATM.[15]

c.   On or about July 18, 2019, JACKSON withdrew $17,200 from Bank Account-13 in the form of a cashier's check. Bank surveillance shows that JACKSON withdrew the funds at a teller window.

d.   On or about July 26, 2019--shortly after receiving the $30,000 wire from Victim-3 on or about July 24, 2019--JACKSON wired $23,965 to a bank account held at a bank in Canada, which is the same bank account that, on or about April 22, 2019, received a $88,950 wire from MARYLYNN PENEUETA, the defendant, in connection with BEC-1, as described above in paragraph 13(e)(iv).

## Fiji Fraud

19.   Based on my discussions with other law enforcement officers and my review of reports prepared by other law enforcement officers, I have learned, among other things, the following:

---

[15]   In the course of this investigation, I have obtained a photograph of JACKSON from records maintained by the Georgia Department of Motor Vehicles.   Based on comparison with this photograph, I believe that the person in the bank surveillance is JACKSON.

a.   In or about 2018, Victim-4, a woman who resides in California, was the intended beneficiary of certain proceeds from the sale of land in Fiji (the "Estate Proceeds"). A law firm in Fiji ("the Fiji Firm") was responsible for sending the Estate Proceeds--which were in the total approximate amount of $380,000--to Victim-4.

b.   On or about October 2, 2018, the Fiji Firm received an email purportedly sent by Victim-4's daughter (who had authority to handle Victim-4's affairs with the Fiji Firm), directing the Fiji Firm to send the Estate Proceeds to a certain bank account in Georgia ("Bank Account-14").   In fact, the email was sent by a third-party, and Bank Account-14 did not belong to Victim-4.   The October 2, 2018 email listed, as the address for the accountholder of Bank Account-14, the home address of NDUKWE ANYAOGU, the defendant.

c.   One or about October 4, 2018 and October 9, 2019, the Fiji Firm sent the Estate Proceeds, by two wire transfers, each in the approximate amount of $194,000, to Bank Account-14.

20.   Based on bank records and other documents and evidence that I have reviewed in the course of this investigation, I have learned, among other things, the following:

a.   The two wire transfers from the Fiji Firm to Bank Account-14 were processed through a correspondent bank located in New York, New York.

b.   Bank Account-14 was opened in person by NDUKWE ANYAOGU, the defendant, on or about October 1, 2018, and lists, as a "d/b/a" of ANYAOGU (the accountholder), the name of Victim-4.   The phone number and email address listed on Bank Account-14 are ANYAOGU's phone number and email address. Account opening documents show that ANYAOGU's driver's license, bearing his photograph, was provided to the bank at the time of account opening.[16]

---

[16]    Bank records for Bank Account-14 list the driver's license number that was provided to the bank at the time of account opening.   As described above at paragraph 16(g), the same driver's license number was provided when ANYAOGU opened another account, Bank Account-9.   Bank records for Bank Account-9

      c.    After Bank Account-14 received the two wires intended for Victim-4 from the Fiji Firm, ANYAOGU withdrew cashier's checks and initiated international wire transfers from Bank Account-14.  For example:

      i.    On or about October 5, 2018, ANYAOGU withdrew $40,000 from Bank Account-14 in the form of a cashier's check payable to another person.  Also on or about October 5, 2018, ANYAOGU wired $97,000 from Bank Account-14 to a bank account held at a bank in Turkey.  This wire was processed through a correspondent bank in New York, New York.

      ii.    On or about October 12, 2018, ANYAOGU withdrew funds from Bank Account-14 to fund a $50,000 cashier's check to another entity controlled by ANYAOGU and a $40,000 cashier's check to another person.  Also on October 12, 2018, ANYAOGU sent two international wires, in the amounts of $194,000 and $10,000 from Bank Account-14 to bank accounts held at banks outside of the United States.  Each of these international wires was processed through a correspondent bank located in New York, New York.

21.    Based on my review of bank records and publicly available documents, I have learned that each of the banks where Phony Counterparty-1 Account, Phony Counterparty-2 Account, Bank Account-1, Bank Account-2, Bank Account-3, Bank Account-4, Bank Account-5, Bank Account-6, Bank Account-7, Bank Account-8, Bank Account-9, Bank Account-10, Bank Account-11, Bank Account-12, Bank Account-13, Bank Account-14, and the AHAIWE Account were opened is insured by the Federal Deposit Insurance Corporation.

22.    Based on my training and experience, individuals who engage in criminal activity--including wire fraud schemes like BEC-1, BEC-2, the Romance Fraud, and the Fiji Fraud--often take steps to conceal the source of proceeds of that criminal activity, that is, to launder the proceeds.  The methods used to launder such criminal proceeds can include, as relevant here, creating new bank accounts in the names of entities and transferring money between those accounts as cash or as cashier's checks.  In cases where the underlying criminal activity occurred outside the United States but the proceeds are

---

include a photocopy of that driver's license, which contains a photograph of ANYAOGU.

sent to the United States to be laundered, the proceeds are
frequently sent back overseas after they have been laundered.

     WHEREFORE, I respectfully request that warrants be
issued for the arrests of JACOB SAGIAO, MARYLYNN PENEUETA, BRITT
JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE OBIKA, NDUKWE
ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR AHAIWE, the
defendants, and that they be arrested, and imprisoned or bailed,
as the case may be.


                                            _____

                                            JARED EANNUCCI
                                            Task Force Officer
                                            United States Attorney's Office for the
                                            Southern District of New York


Sworn to before me this
11 day of February, 2020

_____
THE HONORABLE ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

# EXHIBIT C

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -  X
                                      :
UNITED STATES OF AMERICA              :    INDICTMENT
                                      :
          - v. -                      :    20 Cr.
                                      :
PRINCE UKO,                           :
JACOB SAGIAO,                         :
MARYLYNN PENEUETA,                    :
BRITT JACKSON,                        :
JOSHUA FITTEN,                        :
DONTAE COTTRELL,                      :
ARINZE OBIKA,                         :
NDUKWE ANYAOGU,                       :
HERMAN BASS,                          :
DAVID URO, and                        :
VICTOR AHAIWE,                        :
                                      :
          Defendants.                 :
                                      :
- - - - - - - - - - - - - - - - - -  X
```

## COUNT ONE

### (Conspiracy to Commit Bank Fraud)

The Grand Jury charges:

1.     From at least in or about July 2018 up to and
including at least in or about May 2019, in the Southern
District of New York and elsewhere, PRINCE UKO, JACOB SAGIAO,
MARYLYNN PENEUETA, BRITT JACKSON, JOSHUA FITTEN, DONTAE
COTTRELL, ARINZE OBIKA, NDUKWE ANYAOGU, HERMAN BASS, DAVID URO,
and VICTOR AHAIWE, the defendants, and others known and unknown,
willfully and knowingly, did combine, conspire, confederate, and
agree together and with each other to commit bank fraud, in
violation of Title 18, United States Code, Section 1344.

2.    It was a part and an object of the conspiracy that
PRINCE UKO, JACOB SAGIAO, MARYLYNN PENEUETA, BRITT JACKSON,
JOSHUA FITTEN, DONTAE COTTRELL, ARINZE OBIKA, NDUKWE ANYAOGU,
HERMAN BASS, DAVID URO, and VICTOR AHAIWE, the defendants, and
others known and unknown, willfully and knowingly, would and did
execute and attempt to execute a scheme and artifice to defraud
a financial institution, the deposits of which were then insured
by the Federal Deposit Insurance Corporation, and to obtain
moneys, funds, credits, assets, securities, and other property
owned by, and under the custody and control of, such financial
institution, by means of false and fraudulent pretenses,
representations, and promises, in violation of Title 18, United
States Code, Section 1344.

(Title 18, United States Code, Section 1349.)

## COUNT TWO

### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

3.    From at least in or about July 2018 up to and
including at least in or about May 2019, in the Southern
District of New York and elsewhere, PRINCE UKO, JACOB SAGIAO,
MARYLYNN PENEUETA, BRITT JACKSON, JOSHUA FITTEN, DONTAE
COTTRELL, ARINZE OBIKA, NDUKWE ANYAOGU, HERMAN BASS, DAVID URO,
and VICTOR AHAIWE, the defendants, and others known and unknown,
willfully and knowingly did combine, conspire, confederate, and

2

agree together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

4.     It was a part and an object of the conspiracy that PRINCE UKO, JACOB SAGIAO, MARYLYNN PENEUETA, BRITT JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE OBIKA, NDUKWE ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR AHAIWE, the defendants, and others known and unknown, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, wire fraud schemes involving business email compromises, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

## COUNT THREE

### (Aggravated Identity Theft)

The Grand Jury further charges:

5.     From at least in or about February 2019 up to and including at least in or about May 2019, in the Southern District

of New York and elsewhere, VICTOR AHAIWE, the defendant, knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, AHAIWE controlled and transacted in a bank account of another person, who was deceased, including by using a debit card for that bank account, while holding himself out to be that other person, during and in relation to the bank fraud conspiracy alleged in Count One of this Indictment.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

## COUNT FOUR

### (Wire Fraud)

The Grand Jury further charges:

6.      From at least in or about June 2019 up to and including the present, in the Southern District of New York and elsewhere, BRITT JACKSON, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, JACKSON

4

participated in and received proceeds from an online romance

fraud, in which the victim was induced to send money to JACKSON

based on false representations, and, in furtherance of such

scheme, JACKSON caused an interstate wire to be sent from

Pennsylvania to Georgia, which wire was processed through a bank

located in New York, New York.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FIVE

### (Wire Fraud)

The Grand Jury further charges:

7.    From at least in or about October 2018 up to and

including at least in or about October 2018, in the Southern

District of New York and elsewhere, NDUKWE ANYAOGU, the

defendant, willfully and knowingly, having devised and intending

to devise a scheme and artifice to defraud, and for obtaining

money and property by means of false and fraudulent pretenses,

representations, and promises, did transmit and cause to be

transmitted by means of wire, radio, and television

communication in interstate and foreign commerce, writings,

signs, signals, pictures, and sounds, for the purpose of

executing such scheme and artifice, to wit, ANYAOGU participated

in and received the proceeds from an email compromise scheme in

which a law firm in Fiji was induced to send money to ANYAOGU

based on false representations, and, in furtherance of such

scheme, ANYAOGU caused an international wire to be sent from Fiji to Georgia, which wire was processed through a correspondent bank located in New York, New York.

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATIONS

8. As a result of committing the offense alleged in Count One of this Indictment, PRINCE UKO, JACOB SAGIAO, MARYLYNN PENEUETA, BRITT JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE OBIKA, NDUKWE ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR AHAIWE, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any and all property constituting, or derived from, proceeds the defendant obtained directly or indirectly, as a result of the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

9. As a result of committing the offenses alleged in Count Two of this Indictment, PRINCE UKO, JACOB SAGIAO, MARYLYNN PENEUETA, BRITT JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE OBIKA, NDUKWE ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR AHAIWE, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not

6

limited to a sum of money in United States currency representing the amount of property involved in said offense.

10. As a result of committing the offense alleged in Count Four of this Indictment, BRITT JACKSON, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

11. As a result of committing the offense alleged in Count Five of this Indictment, NDUKWE ANYAOGU, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

### Substitute Asset Provision

12. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due

7

diligence;

      b.   has been transferred or sold to, or deposited with, a third party;

      c.   has been placed beyond the jurisdiction of the court;

      d.   has been substantially diminished in value; or

      e.   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981, 982; Title 21, United States Code, Section 853; and Title 28, United States Code, Section 2461.)

FOREPERSON

GEOFFREY S. BERMAN
United States Attorney

8

Form No. USA-33s-274 (Ed. 9-25-58)

---

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

**PRINCE UKO,**
**JACOB SAGIAO,**
**MARYLYNN PENEUETA,**
**BRITT JACKSON,**
**JOSHUA FITTEN,**
**DONTAE COTTRELL,**
**ARINZE OBIKA,**
**NDUKWE ANYAOGU,**
**HERMAN BASS,**
**DAVID URO, and**
**VICTOR AHAIWE,**

**Defendants.**

---

### INDICTMENT

20 Cr.

(18 U.S.C. §§ 1028A, 1343, 1349,
1956(h), and 2.)

GEOFFREY S. BERMAN
United States Attorney

Foreperson

---

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X
                                   :
UNITED STATES OF AMERICA           :
                                   :
        - v. -                     :
                                   :       **SEALED SUPERSEDING**
SUNDAY OKORO,                      :           **INDICTMENT**
COLLINS ENEH, and                  :
IKECHUKWU ELENDU,                  :       S1 20 Cr. 179 (DLC)
                                   :
        Defendants.                :
                                   :
- - - - - - - - - - - - - - - - - :
                                   :
                                   X

## COUNT ONE

### (Conspiracy to Commit Money Laundering)

The Grand Jury charges:

Overview of the Conspiracy

1.    From at least in or about March 2018 up to and
including at least in or about January 2020, in the Southern
District of New York and elsewhere, SUNDAY OKORO, COLLINS ENEH,
and IKECHUKWU ELENDU, the defendants, and others known and
unknown, conspired to launder the proceeds of various business
email compromise and romance schemes (the "Fraudulent Schemes")
by (i) opening bank accounts in the name of the purported
counterparties to financial transactions and other legitimate
business entities with which the conspirators had no actual
connection; (ii) receiving wires directly from the victims of
those Fraudulent Schemes; (iii) transferring the proceeds of the

Fraudulent Schemes multiple times between such accounts in order to hide the origin and fraudulent nature of the proceeds; and (iv) ultimately transferring most of those proceeds to foreign bank accounts or withdrawing them in cash.

The Fraudulent Schemes

2.    The Fraudulent Schemes that generated the proceeds of specified unlawful activity included but are not limited to the following:

a.    A scheme to defraud a Sint Maarten health services company in or around March 2018 (the "Sint Maarten BEC"). Due to the compromise or mimicking of an email account, on or about March 6, 2018, the health services company was fraudulently induced to send approximately $500,000 to a bank account it believed to be controlled by a counterparty, but was in fact controlled by one or more members of the conspiracy of which SUNDAY OKORO, COLLINS ENEH, and IKECHUKWU ELENDU, the defendants, were members.

b.    A scheme to defraud a South Korean law firm in or around the period from March 2018 to June 2018 (the "South Korea BEC"). Due to the compromise or mimicking of an email account, on or about March 15, April 20, May 21, and June 22, 2018, the law firm was fraudulently induced to send a total of approximately $235,000 to several bank accounts it believed to be controlled by a counterparty, but were in fact controlled by

2

one or more members of the conspiracy of which OKORO, ENEH, and ELENDU were members.

     .c.     A scheme to defraud an intergovernmental organization headquartered in New York, New York in or around July 2018 (the "IGO BEC").  Due to the compromise or mimicking of an email account, on or about July 23 and July 31, 2018, the intergovernmental organization was fraudulently induced to send approximately $340,000 total to a bank account it believed to be controlled by a counterparty, but was in fact controlled by one or more members of the conspiracy of which OKORO, ENEH, and ELENDU were members.

     d.     A scheme to defraud a Fijian law firm in or around October 2018 (the "Fiji BEC").  Due to the compromise or mimicking of an email account, on or about October 4 and October 9, 2018, the law firm was fraudulently induced to send approximately $390,000 total to a bank account it believed to be controlled by a counterparty, but was in fact controlled by one or more members of the conspiracy of which OKORO, ENEH, and ELENDU were members.

     e.     A scheme to defraud a German food processing company in or around March 2019 (the "Germany BEC").  Due to the compromise or mimicking of an email account, on or about March 5, 2019, the food processing company was fraudulently induced to send approximately $4,135,000 to a bank account it believed to

3

be controlled by a counterparty, but was in fact controlled by one or more members of the conspiracy of which OKORO, ENEH, and ELENDU were members.

      f.   A scheme to defraud a Chinese technology company in or around April 2019 (the "China BEC"). Due to the compromise or mimicking of an email account, on or about April 2, 2019, the technology company was fraudulently induced to send approximately $4,088,000 to a bank account it believed to be controlled by a counterparty, but was in fact controlled by one or more members of the conspiracy of which OKORO, ENEH, and ELENDU were members.

      g.   A scheme to defraud an individual victim who resides in Pennsylvania in or around the period from June 2019 until at least August 2019 (the "Pennsylvania Romance Fraud"). The victim was duped into believing that the victim was in a romantic online relationship with "Joseph Cordoba," an individual who did not in fact exist, and the victim was fraudulently induced to send $136,000 to bank accounts the victim believed were paying various expenses for "Joseph Cordoba," but were in fact controlled by one or more members of the conspiracy of which OKORO, ENEH, and ELENDU were members.

      h.   A scheme to defraud a Malaysian shipping company in or around January 2020 (the "Malaysia BEC"). Due to the compromise or mimicking of an email account, on or about January

15, 2020, the shipping company was fraudulently induced to send approximately $220,000 to a bank account it believed to be controlled by a counterparty, but was in fact controlled by one or more members of the conspiracy of which OKORO, ENEH, and ELENDU were members.

### Role in the Offense

3.    SUNDAY OKORO, the defendant, received proceeds from various Fraudulent Schemes, and directed at least one coconspirator ("CC-1") to open bank accounts in the names of legitimate entities with which CC-1 had no affiliation, receive proceeds from various Fraudulent Schemes into those accounts, and further transfer those fraudulent proceeds to others involved in the offense.  For example:

a.    On or about January 15, 2020, CC-1 received a wire for approximately $220,000 as part of the Malaysia BEC that was in fact intended for a counterparty of the victim.  On or about January 17, 2020, at OKORO's direction, CC-1 transferred almost all of that approximately $220,000 to another account CC-1 controlled that was in the name of a legitimate company, but with which CC-1 was not in fact affiliated ("Fraudulent Account-1").  On or about January 31, 2020, at OKORO's direction, CC-1 transferred approximately $151,000 total of those proceeds to two foreign bank accounts and wrote a cashier's check for approximately $40,000 of those proceeds to another coconspirator

5

("CC-2") with whom OKORO resides.

        b.   On or about August 20, 2018, OKORO received approximately $5,000 of the proceeds of the IGO BEC from a coconspirator ("CC-3") into an account OKORO controlled in the name of "Global Concepts."

        c.   On or about March 20, 2018, OKORO received approximately $3,000 of the proceeds of the South Korea BEC from IKECHUKWU ELENDU, the defendant, into an account OKORO controlled in the name of "Global Concepts."

    4.   COLLINS ENEH, the defendant, directed at least three coconspirators to open numerous bank accounts in the names of legitimate entities with which they had no affiliation, receive proceeds from various Fraudulent Schemes into those accounts, and further transfer those fraudulent proceeds to others involved in the offense.  For example:

        a.   On or about February 28, 2019, at ENEH's direction, a coconspirator ("CC-4") opened a bank account in the name of a legitimate company with which CC-4 and ENEH had no affiliation ("Fraudulent Account-2").  On or about March 11, 2019, at ENEH's direction, CC-4 deposited a cashier's check for approximately $35,000 representing proceeds of the Sint Maarten BEC into Fraudulent Account-2.  On or about March 12, 2019, at ENEH's direction, CC-4 withdrew substantially all of the $35,000 from Fraudulent Account-2 in cash.

b.    On or about March 19, 2019, at ENEH's direction,
CC-4 opened a bank account in the name of another legitimate
company with which CC-4 and ENEH had no affiliation, but that
resembled the name of a counterparty of the victim of the China
BEC ("Fraudulent Account-3").  On or about April 2, 2019, the
victim of the China BEC sent a wire for approximately $4,088,000
to Fraudulent Account-3.  The victim of the China BEC had in
fact intended that the wire be sent to a legitimate
counterparty.  On or about April 5, 2019, at ENEH's direction,
CC-4 made the following transactions from Fraudulent Account-3:
(i) CC-4 wired approximately $1,000,000 of those proceeds to a
foreign bank account; (ii) CC-4 wrote a cashier's check for
approximately $290,000 of those proceeds to an entity controlled
by another coconspirator ("CC-5"); (iii) CC-4 wrote a cashier's
check for approximately $250,000 of those proceeds to an entity
controlled by CC-1; and (iv) CC-4 withdrew approximately $50,000
in cash from those proceeds.

c.    On or about March 13, 2019, at ENEH's direction,
CC-5 opened a bank account in the name of a legitimate company
with which CC-5 and ENEH had no affiliation ("Fraudulent
Account-4").  On or about April 8, 2020, at ENEH's direction,
CC-5 deposited the cashier's check for approximately $290,000 of
the proceeds of the China BEC into Fraudulent Account-4.  On or
about April 22, 2018, at ENEH's direction, CC-5 made the

following transactions from Fraudulent Account-4: (i) CC-5 wrote a cashier's check for approximately $20,000 of those proceeds to an entity controlled by CC-4; (ii) CC-5 wrote cashier's checks totaling approximately $32,000 of those proceeds to an entity controlled by another coconspirator ("CC-6"); (iii) CC-5 wrote a cashier's check for approximately $32,000 of those proceeds to an entity controlled by another coconspirator ("CC-7"), and (iv) CC-5 attempted to wire approximately $89,000 to a foreign bank account. On or about April 23, 2019, at ENEH's direction, CC-5 wired approximately $89,000 from Fraudulent Account-4 to a different foreign bank account.

  d. On or about January 9, 2019, at ENEH's direction, CC-6 opened a bank account in the name of a legitimate company with which CC-6 and ENEH had no affiliation ("Fraudulent Account-5"). On or about March 11, 2019, at ENEH's direction, CC-6 deposited a cashier's check for approximately $35,000 representing proceeds of the Sint Maarten BEC into Fraudulent Account-5. On or about March 11, 2019, at ENEH's direction, CC-6 withdrew approximately $34,000 of those proceeds in cash from Fraudulent Account-5.

  e. On or about March 21, 2019, at ENEH's direction, CC-6 opened a bank account in the name of another legitimate company with which CC-6 and ENEH had no affiliation ("Fraudulent Account-6"). On or about April 26, 2019 and April 29, 2019, at

ENEH's direction, CC-6 deposited cashier's checks from CC-5

representing approximately $32,000 of the proceeds of the Sint

Maarten BEC into Fraudulent Account-6.  In the period between

April 26, 2019 and April 30, 2019, at ENEH's direction, CC-6

withdrew approximately $31,000 of those proceeds in cash from

Fraudulent Account-6.

     5.   IKECHUKWU ELENDU, the defendant, opened bank accounts

in the names of legitimate entities with which he had no

affiliation, received proceeds from Fraudulent Schemes into

those accounts, and further transferred those fraudulent

proceeds to others involved in the offense.  He also received

proceeds from various Fraudulent Schemes into other accounts he

controlled.  For example:

          a.   On or about March 1, 2018, ELENDU opened a bank

account in the name of a legitimate company with which ELENDU

had no affiliation, but that resembled the name of a

counterparty of the victim of the South Korea BEC ("Fraudulent

Account-7").  On or about March 15, 2018, the victim of the

South Korea BEC sent a wire for approximately $91,000 to

Fraudulent Account-7.  The victim of the South Korea BEC had in

fact intended that the wire be sent to a legitimate

counterparty.  On or about March 20, 2018, ELENDU transferred

approximately $28,000 of those funds from Fraudulent Account-7

to foreign bank accounts and approximately $3,000 of those funds

from Fraudulent Account-7 to SUNDAY OKORO, the defendant.

b.   On or about March 26, 2019, ELENDU received approximately $50,000 of the proceeds of the Sint Maarten BEC into an account he controlled in the name of "Alik Investment of California," and, on or about March 27, 2019, ELENDU transferred approximately $47,500 of those funds to a foreign bank account.

c.   On or about April 1, 2019, ELENDU received approximately $91,000 in additional proceeds of the Sint Maarten BEC into an account he controlled in the name of "Alik Investment of California," and, on or about April 2, 2019, ELENDU transferred approximately $87,000 of those funds to a foreign bank account.

d.   On or about August 3, 2018, ELENDU received approximately $38,000 of the proceeds of the IGO BEC into an account he controlled in the name of "Alik Investment of California," and on or about August 6, 2018, ELENDU transferred approximately all of those funds to foreign bank accounts.

e.   On or about October 5, 2018, ELENDU received approximately $40,000 of the proceeds of the Fiji BEC into an account in his own name, and, on or about October 9, 2018, ELENDU transferred approximately $38,000 of those funds to foreign bank accounts.

f.   On or about October 12, 2018, ELENDU received approximately $40,000 in additional proceeds of the Fiji BEC

into an account in his own name, and, on or about October 15, 2018, ELENDU transferred approximately $35,000 of those funds to a foreign bank account and withdrew approximately $5,000 of those funds in cash.

g.   On or about March 18, 2019, ELENDU received approximately $50,000 of the proceeds of the Germany BEC into an account he controlled in the name of "Alik Investment of California," and, on or about March 18, 2019, ELENDU transferred approximately $48,000 of those funds to a foreign bank account.

### Statutory Allegations

6.   From at least in or about March 2018 up to and including at least in or about January 2020, in the Southern District of New York and elsewhere, SUNDAY OKORO, COLLINS ENEH, and IKECHUKWU ELENDU, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

7.   It was a part and an object of the conspiracy that SUNDAY OKORO, COLLINS ENEH, and IKECHUKWU ELENDU, the defendants, and others known and unknown, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions which

in fact involved the proceeds of specified unlawful activity, to wit, wire fraud schemes involving business email compromises and romance frauds, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

## COUNT TWO

### (Conspiracy to Commit Bank Fraud)

The Grand Jury further charges:

8.    The allegations contained in paragraphs 1 through 7 of this Superseding Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

9.    From at least in or about March 2018 up to and including at least in or about January 2020, in the Southern District of New York and elsewhere, SUNDAY OKORO, COLLINS ENEH, and IKECHUKWU ELENDU, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344.

10.    It was a part and an object of the conspiracy that SUNDAY OKORO, COLLINS ENEH, and IKECHUKWU ELENDU, the

defendants, and others known and unknown, willfully and knowingly, would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

11.   The schemes to defraud financial institutions included but were not limited to the schemes to defraud financial institutions by opening bank accounts at financial institutions in the names of real entities with which the members of the conspiracy--including SUNDAY OKORO, COLLINS ENEH, and IKECHUKWU ELENDU, the defendants--had no affiliation in order to receive and initiate transfer of funds in the name of those entities. The fraudulently created bank accounts received and transferred proceeds from, among other Fraudulent Schemes, the Sint Maarten BEC, the South Korea BEC, the IGO BEC, the Fiji BEC, the Germany BEC, the China BEC, and the Malaysia BEC.

(Title 18, United States Code, Section 1349.)

## FORFEITURE ALLEGATIONS

12.   As a result of committing the offenses alleged in Count One of this Indictment, SUNDAY OKORO, COLLINS ENEH, and

IKECHUKWU ELENDU, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense.

13.   As a result of committing the offense alleged in Count Two of this Indictment, SUNDAY OKORO, COLLINS ENEH, and IKECHUKWU ELENDU, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any and all property constituting, or derived from, proceeds the defendant obtained directly or indirectly, as a result of the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

### Substitute Asset Provision

14.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

14

       c.    has been placed beyond the jurisdiction of the court;

       d.    has been substantially diminished in value; or

       e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

               (Title 18, United States Code, Sections 981, 982;
                 Title 21, United States Code, Section 853; and
                 Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_Audrey Strauss /KM_
AUDREY STRAUSS
Acting United States Attorney

15

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

**v.**

**SUNDAY OKORO,**
**COLLINS ENEH, and**
**IKECHUKWU ELENDU,**

**Defendants.**

---

**<u>SEALED SUPERSEDING INDICTMENT</u>**

S1 20 Cr. 179 (DLC)

(18 U.S.C. §§ 1349, 1956(h), and 2.)

AUDREY STRAUSS
Acting United States Attorney

Foreperson

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                        :
UNITED STATES OF AMERICA
                                                        :

          -v.-                                          :

                                                        :
ANY AND ALL MONEY CONTAINED IN                                    **20 MAG 5695**
BANK OF AMERICA ACCOUNT NUMBER                          :
466008806549, HELD IN THE NAME OF
"DELATECH VENTURES LLC," AND ALL                        :
FUNDS TRACEABLE THERETO,
INCLUDING ACCRUED INTEREST,                             :

                                                        :
          Defendants-in-rem.


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

### WARRANT OF SEIZURE
### PURSUANT TO 18 U.S.C. §§ 981 and 984

TO:     ANY DESIGNATED OFFICER OF THE UNITED STATES SECRET
        SERVICE, THE FEDERAL BUREAU OF INVESTIGATION, THE UNITED
        STATES ATTORNEY'S OFFICE FOR THE SOUTHERN DISTRICT OF NEW
        YORK, AND/OR ANY LAW ENFORCEMENT OFFICER AUTHORIZED BY
        LAW

        An Affidavit having been made before me by Jared Eannucci, a Task Force

Officer with the United States Attorney's Office for the Southern District of New York, that he

has reason to believe that the above-captioned funds are subject to seizure and civil forfeiture

pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 984, and as I am satisfied that there is probable cause

to believe that the property so described is subject to seizure and civil forfeiture pursuant to 18

U.S.C. §§ 981(a)(1)(C) and 984;

        YOU ARE HEREBY COMMANDED AND AUTHORIZED to seize, within

fourteen (14) days of the date of issuance of this warrant, by serving a copy of this warrant of

seizure upon any person presently in possession of the property described as follows:

> ANY AND ALL MONEY IN BANK OF AMERICA ACCOUNT
> 466008806549, HELD IN THE NAME OF "DELATECH VENTURES
> LLC", AND ALL FUNDS TRACEABLE THERETO, INCLUDING
> ACCRUED INTEREST

YOU ARE FURTHER COMMANDED AND AUTHORIZED to prepare a

written inventory of the property seized and promptly return this warrant and inventory before

this Court as required by law.

IT IS FURTHER ORDERED THAT the above-listed accounts shall be frozen

upon service of this warrant, in order to prevent the above-captioned funds from being

transferred, withdrawn, or removed therefrom, except that transfers into the accounts shall

continue to be permitted for a period of 10 days after service of this warrant.

Dated: New York, New York
        June 1, 2020


_____
HON. STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK